UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KRISTI VUKSANOVICH and MARK VUKSANOVICH, <br><br> Plaintiffs, <br><br> -v.- <br><br> AIRBUS AMERICAS, INC., AIRBUS S.A.S., and AIRBUS AMERICAS ENGINEERING, INC., <br><br> Defendants. | 21 Civ. 3454 (KPF) |
| AMYSUE SALVATORE and MICHAEL F. SALVATORE, <br><br> Plaintiffs, <br><br> -v.- <br><br> AIRBUS AMERICAS, INC., AIRBUS S.A.S., and AIRBUS AMERICAS ENGINEERING, INC., <br><br> Defendants. | 21 Civ. 3487 (KPF) <br><br> **OPINION AND ORDER** |

KATHERINE POLK FAILLA, District Judge:

Plaintiffs Kristi Vuksanovich and Amysue Salvatore are former JetBlue flight attendants; each alleges long-term physical and neurological health conditions as a consequence of their prolonged exposure to toxic fumes in the passenger cabins of airplanes manufactured by Defendants Airbus Americas, Inc. and Airbus S.A.S. (together, "Airbus," or "Defendants").[1]  For these

---

[1]  Defendant Airbus Americas Engineering, Inc. was merged into Defendant Airbus Americas, Inc. in 2017, and consequently no longer exists as an independent legal entity.  (*See* No. 20 Civ. 3454 (KPF), Dkt. #75 at 4 n.1).  In opposing Defendants' motion to dismiss, Plaintiffs do not present any argument why their claims should survive against an entity that was subsumed by Defendant Airbus Americas, Inc. when these consolidated cases were filed.  Thus, the Court dismisses at the outset all claims asserted against Airbus Americans Engineering, Inc.  *See, e.g.*, *Gordon* v. *Target Corp.*, No. 20 Civ. 9589 (KMK), 2022 WL 836773, at *17 (S.D.N.Y. Mar. 18, 2022) ("[A]

injuries, Mrs. Vuksanovich and Mrs. Salvatore each brought suit against Defendants, asserting claims sounding in strict products liability, negligence, and breach of warranty.  Their spouses, Plaintiffs Mark Vuksanovich and Michael Salvatore (together with Mrs. Vuksanovich and Mrs. Salvatore, "Plaintiffs"), also assert derivative claims against Defendants for damages based on loss of consortium.  Defendants now move to dismiss these two consolidated actions pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that Plaintiffs' claims are time-barred and inadequately pleaded.

For the reasons outlined below, the Court finds that Mr. and Mrs. Salvatore's claims are time-barred and thus dismisses all claims asserted in the *Salvatore* action.  The Court concludes differently with respect to Mr. and Mrs. Vuksanovich, who have stated timely claims for strict products liability, negligence, breach of the implied warranty of merchantability, and loss of consortium.  Mrs. Vuksanovich has not, however stated a claim for breach of express warranty.

## BACKGROUND[2]

### A.    Factual Background

#### 1.    The Airbus Bleed Air System

These consolidated cases concern the allegedly defective design of the "bleed" air system used in the Airbus A320 family of commercial aircraft.

---

plaintiff's failure to respond to contentions raised in a motion to dismiss constitute[s] an abandonment of those claims.").

[2]   This Opinion draws its facts from the second amended complaints filed in the consolidated actions, the well-pleaded allegations of which are taken as true for purposes of the instant motion.  (*See Vuksanovich* v. *Airbus Americas, Inc.* ("*Vuksanovich*"), No. 20 Civ. 3487 (KPF), Dkt. #49 ("Vuksanovich SAC"); *Salvatore* v.

(Vuksanovich SAC ¶¶ 6, 18; Salvatore SAC ¶¶ 5, 18).  Defendants' bleed air system consists of a network of ducts, valves, and regulators that draws compressed air from an aircraft's engine and pumps it directly into the passenger cabin.  (Vuksanovich SAC ¶¶ 24-27; Salvatore SAC ¶¶ 24-27).  The air that is "bled" from the aircraft's engine is used for several purposes, including cabin pressurization and air conditioning.  (Vuksanovich SAC ¶¶ 27-28; Salvatore SAC ¶¶ 27-28).  As a function of alleged design defects in the bleed air system, Airbus aircraft tend to experience "fume" events, or instances in which the air inside of the passenger cabin of an aircraft becomes contaminated with pyrolyzed compounds that are toxic to humans, such as engine oil, deicing fluid, or hydraulic fluid.  (Vuksanovich SAC ¶¶ 25, 36; Salvatore SAC ¶¶ 25, 35).  The bleed air system allows these toxic substances to contaminate cabin air during an airplane's normal operation, but the levels of toxins are especially high during fume events.  (Vuksanovich SAC ¶ 32; Salvatore SAC ¶ 31).

Bleed air that enters the passenger cabin of an aircraft is neither filtered nor monitored for levels of airborne toxicants.  (Vuksanovich SAC ¶ 38; Salvatore SAC ¶ 37).  Among the contaminants that can infiltrate the cabin are byproducts of engine exhaust, such as carbon monoxide and carbon dioxide,

---

*Airbus Americas, Inc.* ("*Salvatore*"), No. 20 Civ. 3487 (KPF), Dkt. #50 ("Salvatore SAC")). For ease of reference, citations to the docket in this Opinion are to the docket in the lead case, *Vuksanovich*, unless otherwise specified.

Throughout the remainder of this Opinion, the Court refers to Defendants' memorandum of law in support of their motion to dismiss as "Def. Br." (Dkt. #75); Plaintiffs' memorandum of law in opposition to Defendants' motion to dismiss as "Pl. Opp." (Dkt. #76); and Defendants' reply memorandum of law as "Def. Reply" (Dkt. #77).

as well as constituents of jet engine oil, hydraulic fluids, and deicing fluids, such as tricresyl phosphates, which are a species of organophosphates and are known neurotoxins.  (Vuksanovich SAC ¶¶ 39-43; Salvatore SAC ¶¶ 38-42). The presence of a sufficient amount of engine-related contaminants can sometimes produce a distinctive odor that has been described as a chemical, oily, or "dirty socks" smell.  (Vuksanovich SAC ¶ 37; Salvatore SAC ¶ 36).

### 2.   The Vuksanovich Allegations

Mrs. Vuksanovich, a former flight attendant with JetBlue Airways Corporation, has flown on several A320 aircraft that were designed, manufactured, and assembled by Airbus.  (Vuksanovich SAC ¶¶ 2, 10-14).  She alleges experiencing myriad symptoms — some transient, others permanent — during and after certain flights that she took on Airbus aircraft.  (*Id.* at ¶¶ 53, 60, 65, 79, 81, 88).  As detailed below, some of her symptoms coincided with fume events that she experienced while on Defendants' aircraft, while others arose without an apparent connection to a fume event.

Mrs. Vuksanovich alleges that her earliest symptoms manifested on June 16, 2017, during a round-trip flight between Boston and Dallas-Fort Worth.  (Vuksanovich SAC ¶¶ 45-55).  During this trip, Mrs. Vuksanovich, along with other members of the inflight crew and passengers, noticed an odor in the cabin that smelled like dirty socks or a wet dog.  (*Id.* at ¶¶ 49-50).  Upon landing in Dallas, Mrs. Vuksanovich called her husband and told him that she was not feeling well and that her throat felt like it was sunburned.  (*Id.* at ¶ 51). On the return flight to Boston, the same smell persisted and grew in intensity.

(*Id.* at ¶ 52).  While working this flight, Mrs. Vuksanovich and other members of the inflight crew experienced symptoms including headache, nausea, stomach pain, a burning sensation in the throat, coughing, and shortness of breath.  (*Id.* at ¶ 53).  Following the flight, Mrs. Vuksanovich continued to suffer from severe nausea, headaches, burning in her throat, confusion, severe muscle weakness, fatigue, and anxiety.  (*Id.* at ¶ 55).  These symptoms subsided after approximately one week.  (*Id.*).

The following month, on July 7, 2017, Mrs. Vuksanovich experienced similar symptoms while working on a flight from Los Angeles to Boston. (Vuksanovich SAC ¶¶ 56-59).  Shortly after takeoff, Mrs. Vuksanovich developed an intense headache, a sore throat, and a hoarse voice.  (*Id.* at ¶ 59). As the flight continued, she experienced intense nausea, stomach pain, and a bloody nose.  (*Id.*).  For approximately two weeks after the flight, Mrs. Vuksanovich was in pain and suffered from loss of voice, respiratory irritation, bronchial spasms, anxiety, insomnia, headaches, diarrhea, loss of balance, coughing, wheezing, flu-like symptoms, tremors, extreme fatigue, memory loss, and muscle weakness.  (*Id.* at ¶ 60).

Mrs. Vuksanovich was exposed to another fume event on August 29, 2017, while working on a flight from Boston to Portland.  (Vuksanovich SAC ¶¶ 61-67).  Prior to takeoff, Mrs. Vuksanovich and the other flight attendants on board observed a smoky, burning smell, which they initially thought was emanating from a fire on board the plane.  (*Id.* at ¶ 64).  Upon learning of the smell, the captain turned off the secondary engine, maneuvered the aircraft

back to the gate, and requested that the plane undergo maintenance.  (*Id.* at ¶ 66).  While on this aircraft, Mrs. Vuksanovich's vision blurred to the point she was unable to read the placard above the aircraft boarding door.  (*Id.* at ¶ 65).  She does not allege experiencing any lingering symptoms following this flight.

On October 14, 2017, Mrs. Vuksanovich was again exposed to toxic cabin fumes while working on another JetBlue flight, after which she returned home feeling horribly ill.  (Vuksanovich SAC ¶¶ 69-73).  Following this flight, she could not speak properly, had widespread and severe pain throughout her body, was unable to follow a conversation, trembled in her sleep, experienced jerks and tremors in her arms, had trouble walking, and had persistent splitting headaches that completely whitened her vision.  (*Id.* at ¶ 72).

Mrs. Vuksanovich sought medical attention for migraines in November 2017.  More specifically, on November 7, 2017, Mrs. Vuksanovich was treated by a doctor who observed that she was displaying symptoms of chemical and environmental sensitivity, severe fatigue, neurocognitive deficits, and anxiety.  (Vuksanovich SAC ¶ 81).  This doctor indicated that these symptoms were associated with exposure to toxic fumes while working.  (*Id.*).  Approximately three weeks after seeing this doctor, Mrs. Vuksanovich saw a functional medicine doctor who diagnosed her with organophosphate poisoning.  (*Id.* at ¶ 82).  In the ensuing months, an expert physician confirmed that the toxic fumes to which she had been exposed had caused her long-term health effects, which results were confirmed through an October 2018 SPECT scan.  (*Id.* at

¶ 83).  Additionally, in July 2018, Mrs. Vuksanovich received a test measuring the level of serum-derived autoantibodies in her blood — a possible indicator of nerve damage — which revealed that she had been afflicted with a chronic nervous system injury.  (*Id.* at ¶ 84).

In light of her condition, Mrs. Vuksanovich's doctors provided her with specific medical protocols to follow while flying.  (Vuksanovich SAC ¶ 78).  She followed these instructions on June 25, 2019, when she and her husband took a JetBlue passenger flight from Boston to Orlando.  (*Id.* at ¶ 74).  Yet, these protective measures did not prevent her from developing severe symptoms that sent her to the emergency room and resulted in a four-day hospital stay.  (*Id.* at ¶ 79).

Ultimately, an expert physician diagnosed Mrs. Vuksanovich with Aerotoxic Syndrome, an irreversible condition connected to exposure to toxic cabin fumes in commercial aircraft.  (Vuksanovich SAC ¶ 86).  Due to her exposure to contaminated cabin air, Plaintiff has suffered a brain injury and continues to suffer from a litany of symptoms, including nausea, muscle pain, gastrointestinal difficulties, sensory sensitivity, extreme fatigue, rashes, balance problems, decreased motor skills, tremors, dizziness, vertigo, shortness of breath, blurred vision, problems sleeping, severe migraines, memory loss, trouble concentrating, emotional distress, and anxiety.  (*Id.* at ¶ 88).  Because of this enduring medical condition, Mrs. Vuksanovich is unable to live the normal life she previously enjoyed.  (*Id.*).

### 3.     The Salvatore Allegations

Mrs. Salvatore is also a former JetBlue flight attendant, who flew on multiple Airbus aircraft.  (Salvatore SAC ¶¶ 2, 9-14).  As alleged, Mrs. Salvatore's sickness evolved along a different course than Mrs. Vuksanovich's. Mrs. Salvatore first began experiencing serious illness during and after work in January 2017.  (*Id.* at ¶ 44).  Among her symptoms were pain, difficulty breathing, and worsening eyesight.  (*Id.*).  On one occasion, Mrs. Salvatore's symptoms were so acute that she went to the hospital believing she was having a heart attack.  (*Id.* at ¶ 45).  The emergency room physicians confirmed that she was not having a cardiac event, but they were unable to identify the cause of her symptoms.  (*Id.*).  Mrs. Salvatore's illness progressively worsened throughout 2017, but still no doctor was able to identify the etiology of her symptoms.  (*Id.* at ¶ 46).

Mrs. Salvatore experienced a fume event on October 19, 2017, while working on a flight from Boston to San Diego.  (Salvatore SAC ¶¶ 47-55).  While the plane was taxiing, Mrs. Salvatore reported to the captain that she heard the hydraulics "barking" in the rear of the aircraft for an unusually long time.  (*Id.* at ¶ 50).  While the inflight crew prepared for inflight service, one of the flight attendants noticed a "strong, chemical-type smell" near the front of the plane that was so pungent it made him lightheaded.  (*Id.* at ¶ 51).  Mrs. Salvatore investigated the smell and encountered an overwhelming odor toward the front of the plane that made her mind foggy, caused her eyes to burn, and blurred

her vision.  (*Id.* at ¶ 52).  Approximately four hours after taking off from Boston, the captain made an emergency landing in Denver.  (*Id.* at ¶¶ 52-53).

While in Denver, first responders were called to meet the aircraft. (Salvatore SAC ¶ 54).  When firefighters boarded the plane, their carbon monoxide monitors began to beep.  (*Id.*).  Paramedics evaluated the inflight crew, including Mrs. Salvatore, on the jet bridge outside of the aircraft, while passengers remained in their seats.  (*Id.*).  After the aircraft's doors had been open for nearly an hour, a maintenance crew entered the plane, noticed the odor had dissipated, and cleared the plane to continue flying to San Diego.  (*Id.* at ¶ 56).  Mrs. Salvatore and the other flight attendants were unable to get back on the plane, so JetBlue replaced the inflight crew and allowed the plane to take off for San Diego.  (*Id.* at ¶ 57).

Mrs. Salvatore alleges that she was exposed to toxic fumes during the October 19, 2017 flight, as well as on other flights throughout 2017.  (Salvatore SAC ¶ 58).  As a result of her exposure to contaminated cabin air, Mrs. Salvatore continues to suffer from compromised motor skills, tremors, sleeping issues, memory loss, vision loss, trouble concentrating, cognitive defects, depression, and anxiety.  (*Id.* at ¶ 61).  Furthermore, Mrs. Salvatore is unable to live the normal life she previously enjoyed.  (*Id.* at ¶¶ 61-62).

## B.   Procedural Background

Mrs. Vuksanovich initially commenced this action in the United States District Court for the District of Massachusetts on October 14, 2020. (*Vuksanovich* Dkt. #1).  Mrs. Salvatore filed her case in the same jurisdiction

five days later, on October 19, 2020.  (*Salvatore* Dkt. #1).  Defendants moved to dismiss both complaints for lack of personal jurisdiction and failure to state a claim.  (*Vuksanovich* Dkt. #6-7; *Salvatore* Dkt. #5-6).  On February 8, 2021, Plaintiffs filed amended complaints, which added Mr. Vuksanovich and Mr. Salvatore as plaintiffs to each of the respective cases.  (*Vuksanovich* Dkt. #10; *Salvatore* Dkt. #9).  Thereafter, on February 22, 2021, Defendants renewed their motions to dismiss.  (*Vuksanovich* Dkt. #13-14; *Salvatore* Dkt. #12-13).

On March 8, 2021, during the pendency of Defendants' motions to dismiss, Plaintiffs sought to transfer the cases from the District of Massachusetts to the Southern District of New York, which transfer was effectuated on April 20, 2021.  (*Vuksanovich* Dkt. #18, 27; *Salvatore* Dkt. #18, 29).  Upon transfer to this District, but prior to the consolidation of the two matters, the *Vuksanovich* action was assigned to this Court, and the *Salvatore* action was assigned to United States District Judge Analisa Torres.  The *Vuksanovich* plaintiffs and the *Salvatore* plaintiffs filed their Second Amended Complaints on July 29, 2021, and August 3, 2021, respectively.  (*Vuksanovich* Dkt. #49; *Salvatore* Dkt. #50).

On September 3, 2021, Defendants filed a pre-motion letter in the *Vuksanovich* matter indicating their intent to dismiss the Second Amended Complaint.  (*Vuksanovich* Dkt. #67).  Six days later, Defendants filed a similar letter in the *Salvatore* action.  (*Salvatore* Dkt. #72).  On October 9, 2021, after this Court and Judge Torres had set briefing schedules for Defendants' motions to dismiss, Plaintiffs filed an unopposed motion to consolidate the *Vuksanovich*

10

and *Salvatore* cases.  (*Vuksanovich* Dkt. #70-71; *Salvatore* Dkt. #77).  This Court granted the consolidation motion on October 14, 2021, and in doing so directed Defendants to file a single consolidated motion to dismiss the two Second Amended Complaints and Plaintiffs to file a single consolidated opposition.  (*Vuksanovich* Dkt. #72; *Salvatore* Dkt. #78).

Defendants filed their consolidated motion to dismiss on October 25, 2021.  (Dkt. #74-75).  Plaintiffs filed their consolidated opposition brief on November 15, 2021.  (Dkt. #76).  And on November 29, 2021, Defendants filed their consolidated reply brief.  (Dkt. #77).  Accordingly, Defendants' motion to dismiss is fully briefed and ripe for the Court's review.

## DISCUSSION

### A.    Motions to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).  "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Allco Fin. Ltd.* v. *Klee*, 861 F.3d 82, 94-95 (2d Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678).  "While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.'"  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570).  "[A]lthough a court

11

must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (internal quotation marks, alterations, and citation omitted); *see also Rolon* v. *Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (explaining that a court need not accept "conclusory allegations or legal conclusions masquerading as factual conclusions").

## B.    Timeliness

Defendants' principal argument for dismissal is that all of Plaintiffs' claims are time-barred under New York's toxic tort limitations period, specified by New York Civil Practice Law and Rules ("C.P.L.R.") § 214-c.  (Def. Br. 5-13). On Defendants' view, the statute of limitations began to run the moment Mrs. Vuksanovich and Mrs. Salvatore began experiencing symptoms of toxic fume exposure, which emerged for both individuals beyond the three-year limitations period applicable to their claims.  (*Id.* at 5).  It follows that if Mrs. Vuksanovich's and Mrs. Salvatore's personal injury claims are untimely, so too are their husbands' derivative claims for loss of consortium.  (*Id.* at 13-14).

As the Court explains below, there are salient distinctions between Mrs. Vuksanovich's and Mrs. Salvatore's allegations concerning the evolution of their symptoms that lead to different conclusions as to the timeliness of their claims.  For her part, Mrs. Salvatore alleges that she first experienced symptoms of toxic fume exposure more than three years before her action, which symptoms "progressively worsened throughout 2017."  (Salvatore SAC

¶ 46).  Because there is no indication in her pleadings that her symptoms abated, the Court finds that Mrs. Salvatore's personal injury claims accrued beyond the applicable limitations period and are thus untimely.  It follows that Mr. Salvatore's derivative claims are also untimely.  Mrs. Vuksanovich, on the other hand, plausibly alleges that prior to the limitations period, she experienced only transient symptoms that are insufficient to trigger the limitations period for her personal injury claims based on a permanent condition.  Because Mrs. Vuksanovich's claims can plausibly be read as accruing within the limitations period, both her and her husband's claims are timely.

### 1.    Personal Injury Claims and C.P.L.R. § 214-c(2)[3]

Under New York law, the general limitations period for personal injury claims is three years.  C.P.L.R. § 214(5).  For claims involving personal injury caused by the latent effects of exposure to a harmful substance, this three-year limitations period begins to run "from the date of discovery of the injury by the plaintiff or from the date when through the exercise of reasonable diligence such injury should have been discovered by the plaintiff, whichever is earlier."

---

[3]    The parties do not dispute that New York law applies to this case, as Plaintiffs reference New York law in both Second Amended Complaints (*Vuksanovich* SAC ¶¶ 16-17; *Salvatore* SAC ¶¶ 16-17), and the parties analyze New York law in their briefing on this motion (*see* Def. Br. 5; Pl. Opp. 11-12).  Accordingly, the Court applies New York law to Plaintiffs' claims.  *See Krumme* v. *Westpoint Stevens Inc.,* 238 F.3d 133, 138 (2d Cir. 2000) (explaining that the parties' "implied consent … is sufficient to establish choice of law"); *see also Valentini* v. *Grp. Health Inc.*, No. 20 Civ. 9526 (JPC), 2021 WL 2444649, at *6 (S.D.N.Y. June 15, 2021) ("The parties do not dispute that New York law applies in this case, and the Court accordingly applies that law.").

C.P.L.R. § 214-c(2); *accord Bethpage Water Dist.* v. *Northrop Grumman Corp.*, 884 F.3d 118, 125 (2d Cir. 2018).

The New York Court of Appeals has held that the time for bringing an action under Section 214-c(2) begins to run "when the injured party discovers the primary condition on which the claim is based." *Matter of N.Y. Cnty. DES Litig. (Wetherill* v. *Eli Lilly & Co.)*, 89 N.Y.2d 506, 509 (1997). "Discovery of the injury" for purposes of the toxic exposure extension refers to "discovery of the physical condition and not ... the more complex concept of discovery of both the condition and the nonorganic etiology of that condition." *Id.* at 514. "In other words, '[t]he three year limitations period runs from the date when plaintiff first noticed symptoms, rather than when a physician first diagnosed those symptoms.'" *Gaillard* v. *Bayer Corp.*, 986 F. Supp. 2d 241, 246 (E.D.N.Y. Dec. 13, 2013) (quoting *Galletta* v. *Stryker Corp.*, 283 F. Supp. 2d 914, 917 (S.D.N.Y. 2003)). "The fact that there may be a delay before the connection between the symptoms and the injured's exposure to a toxic substance is recognized does not delay the start of the limitations period." *Trisvan* v. *Heyman*, 305 F. Supp. 3d 381, 396 (E.D.N.Y. 2018) (internal quotation marks and alterations omitted) (quoting *Bano* v. *Union Carbide Corp.*, 361 F.3d 696, 709 (2d Cir. 2004)).

It may be the case that "early symptoms" can be "too isolated or inconsequential to trigger the running of the Statute of Limitations[.]" *Paesano* v. *Ethicon, Inc.*, No. 19 Civ. 10979 (CS), 2022 WL 846899, at *6 (S.D.N.Y. Mar. 22, 2022) (quoting *Wetherill*, 89 N.Y.2d at 514 n.4). "The theory behind

14

this potential exception, as articulated by the Court of Appeals, is that some early symptoms could be so isolated or inconsequential, either in terms of frequency or seriousness, that they would not put a plaintiff on notice of the underlying injury or disease." *Gaillard*, 986 F. Supp. 2d at 247. "New York courts have not established a bright-line rule for when symptoms or manifestations of a physical condition are sufficient to trigger [Section] 214-c," but have instead "tailored their inquires as to when a legally cognizable injury exists in toxic tort cases to the particular facts before them[.]" *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 758 F.3d 202, 211 (2d Cir. 2014). Relevant factors include, "the extent of plaintiff's exposure to a toxic substance, her medical history, the onset of her symptoms, and the manifestations of a particular illness or disease." *Id.*

New York also employs a "second injury" or "two injury" rule, which preserves the timeliness of an exposure-related injury that is "separate and distinct" from an earlier, time-barred injury that originated from the same source. *See Snyman* v. *W.A. Baum Co.,* No. 04 Civ. 2709 (LTS) (DFE), 2008 WL 4452139, at *5 (S.D.N.Y. Sept. 30, 2008) ("The 'two-injury' rule provides that manifestations of injuries in toxic tort cases that do not become apparent until many years of exposure may be actionable if they are 'separate and distinct' from an earlier medical problem caused by the same problem, even if the statute of limitations on the previous injury has expired."); *accord Fusaro* v. *Porter-Hayden Co.*, 548 N.Y.S.2d 856 (Sup. Ct. 1989), *aff'd*, 565 N.Y.S.2d 357 (1st Dep't 1991) (concluding that mesothelioma resulting from asbestos

exposure was separate and distinct from asbestosis resulting from same cause).

## 2.   The *Salvatore* Claims Are Time-Barred

The Court begins its analysis with the timeliness of Mrs. Salvatore's personal injury claims.  Defendants argue that Mrs. Salvatore's limitations period began to run when she first noticed symptoms arising from the injury that forms the basis of her claims.  (Def. Br. 5, 12).  On this logic, Mrs. Salvatore's claims accrued in January 2017, when she "began experiencing serious illness," including "pain, difficulty, breathing, and worsening eyesight." (Salvatore SAC ¶ 44).  Because these symptoms put Mrs. Salvatore on notice of the primary conditions for which she complains, Defendants assert that she had until January 2020 by which to file her personal injury claims, and thus her October 2020 lawsuit was filed nine months too late.  (Def. Br. 12).

Mrs. Salvatore frames her claims differently, asserting that she is seeking to recover only for "life-altering brain injuries that have not, and will never, go away," and not her earlier, more ephemeral symptoms.  (Pl. Opp. 11).  In furtherance of this theory, Mrs. Salvatore divides her allegations of fume exposure into two categories: (i) the October 19, 2017 fume event that caused the permanent injuries for which she seeks relief and (ii) earlier events where she experienced only transient symptoms.  (*Id.* at 9-10).  Mrs. Salvatore urges the Court to largely disregard the latter category of allegations because she is not "seeking damages for relatively minor transient symptoms" that she

experienced more than three years prior to the commencement of this action. (*Id.* at 12).

Mrs. Salvatore's attempt to disaggregate her earlier symptoms from the permanent brain and nervous system injuries she now claims flatly contradicts the allegations in her Second Amended Complaint. Most importantly, nowhere in her pleadings does Mrs. Salvatore allege that the symptoms she experienced in January 2017 subsided. To the contrary, she alleges that following the onset of her symptoms, her illness "progressively worsened throughout 2017." (Salvatore SAC ¶ 46). It strains her allegations beyond recognition to understand her progressively intensifying illness as involving merely transient symptoms that came and went. This is not how Mrs. Salvatore alleges her illness developed, and the Court will not permit her to amend her pleadings via her opposition brief. *See, e.g.*, *Green* v. *Covidien LP,* No. 18 Civ. 2939 (PGG), 2019 WL 4142480, at *2 (S.D.N.Y. Aug. 30, 2019) ("Plaintiff cannot use her opposition brief to amend the Amended Complaint.").

In an effort to anchor her injuries to a timely event, Mrs. Salvatore underscores the fact that no known fume events are alleged in the Second Amended Complaint prior to October 19, 2017. (Pl. Opp. 9, 11). But crediting Mrs. Salvatore's purported causal link between this fume event and her conditions would require the Court to distort her allegations. Mrs. Salvatore indeed alleges that levels of contaminants in cabin air are particularly high during fume events; yet she also notes that such "[a]ir contamination can occur during normal operation of the airplane." (Salvatore SAC ¶ 31). And despite

17

detailing only a single fume event, Mrs. Salvatore alleges that she "was exposed to toxic cabin fumes during [the October 19, 2017] flight, and was repeatedly exposed to toxic cabin fumes on Defendants' aircraft throughout 2017 that caused her severe illness and personal injuries." (*Id.* at ¶ 58). By Mrs. Salvatore's own allegations, her injuries were not isolated to the single fume event that occurred precisely three years prior to her instituting this lawsuit. They are, instead, alleged to be a function of repeated exposure to jet engine fumes on Defendants' aircraft, the symptoms of which first manifested in January 2017. Because Mrs. Salvatore alleges that she began to exhibit symptoms of the condition that forms the basis of these claims more than three years prior to initiating this action, her claims are time-barred under Section 214-c.

Neither can the symptoms that Mrs. Salvatore alleges that she suffered in January 2017 be deemed "too isolated or inconsequential" to delay the triggering of the statute of limitations. As previously mentioned, the onset of Mrs. Salvatore's symptoms, which included pain, difficulty breathing, and worsening eyesight, "progressively worsened" throughout the year. (Salvatore SAC ¶ 46). Even if these early symptoms were "too isolated or inconsequential" to trigger the statute of limitations — which the Court finds implausible — Mrs. Salvatore alleges that on one occasion prior to October 19, 2017, her symptoms were so severe that she went to the emergency room believing she was having a heart attack. (*Id.* at ¶ 45). The gradual worsening of Mrs. Salvatore's symptoms, combined with the visit to the emergency room, refutes the

18

argument that her pre-October 2017 symptoms were sufficiently "isolated or inconsequential" to disclaim her discovery of the primary condition for which she now complains.  *See, e.g.*, *Ward* v. *Lincoln Elec. Co.*, 983 N.Y.S.2d 718, 719 (1st Dep't 2014) (finding "persistent, severe, progressively worsening symptoms that limited [plaintiff's] physical activity, for which he sought regular, ongoing medical treatment" not to be "too isolated or inconsequential"); *Gaillard*, 986 F. Supp. 2d at 247-48 (finding allegations of an increasingly worsening skin condition, combined with several doctor's visits, to refute the contention that plaintiff's early symptoms were "isolated or inconsequential"); *Oeffler* v. *Miles Inc.*, 660 N.Y.S.2d 897, 900 (3d Dep't 1997) (finding early symptoms of pesticide exposure, including "sinus problems and nausea" that manifested immediately after noticing "awful" smell of pesticides and "headaches and blurred vision" that occurred within two to three months thereafter, sufficient to trigger statute of limitations).

Nor does Mrs. Salvatore's initial inability to discern the source of her symptoms toll the statute of limitations.  (*See* Pl. Opp. 10).  Mrs. Salvatore alleges that although the attending emergency room physicians could rule out the occurrence of a heart attack, they were unable to identify the cause of her symptoms.  (Salvatore SAC ¶ 45).  Even as her symptoms progressively worsened, Mrs. Salvatore's doctors still could not identify the cause.  (*Id.* at ¶ 46).  But the date on which Mrs. Salvatore established the connection between her symptoms and exposure to toxic fumes on Defendants' airplanes is beside the point, because it is well-established that "the date of discovery of

19

the symptoms, rather than the diagnosis of the cause of the symptoms, is the trigger for Section 214-c." *Gaillard*, 986 F. Supp. 2d at 246.  That Mrs. Salvatore's symptoms gradually worsened for a then-unspecified reason in no way alters this analysis.  *See, e.g.*, *Paesano*, 2022 WL 846899, at *7 ("That [plaintiff's] symptoms worsened … does not extend her time to sue, because '[u]nder New York law, neither erroneous diagnoses [nor] progressive deterioration of a patient's condition tolls the statute of limitations.'" (quoting *Ferreri* v. *McGhan Med. Corp.,* No. 95 Civ. 6189 (RPP), 1997 WL 580714, at *3 (S.D.N.Y. Sept. 17, 1997))); *Bartlett* v. *Moore Bus. Forms, Inc.*, No. 96 Civ 1632 (NAM), 2000 WL 362022, at *4 (N.D.N.Y. Mar. 30, 2000) ("Even where the claimant contends that the symptoms worsened and changed subsequent to his or her first awareness of the condition … the *Wetherill* rule applies and the claim accrues when the plaintiff is first aware of the condition for which the damages are sought."); *Whitney* v. *Quaker Chem. Corp.*, 90 N.Y.2d 845, 847 (1997) ("Neither plaintiff's contention that his symptoms worsened and changed … nor the diagnosis of a doctor he first visited … makes his claim timely.").

Because Mrs. Salvatore suffered symptoms of the injuries for which she now seeks damages for more than three years before filing suit, her claims are time-barred.  It necessarily follows that Mr. Salvatore's loss-of-consortium claim, which is derivative of his spouse's primary cause of action, is also untimely.  *See Dunham* v. *Covidien LP*, No. 19 Civ. 2851 (LLS), 2019 WL 6341179, at *7 (S.D.N.Y. Nov. 27, 2019) ("As loss of consortium is a derivative

claim, Mrs. Dunham's loss of consortium claims survive only to the extent that Mr. Dunham's claims do."); *Hanlon* v. *Gliatech, Inc.*, No. 07 Civ. 1737 (SJF) (AKT), 2008 WL 4773430, at *4 (E.D.N.Y. Oct. 27, 2008) ("[A] loss of consortium … cause of action … is governed by the same period of limitations which controls the underlying cause of action." (quoting *Rothfarb* v. *Brookdale Hosp.*, 527 N.Y.S.2d 473, 475 (2d Dep't 1988))).  Accordingly, the Court dismisses all of the claims asserted by Mr. and Mrs. Salvatore.

### 3.    The *Vuksanovich* Claims Are Timely

#### a.    Mrs. Vuksanovich's Claims

Turning next to the timeliness of Mrs. Vuksanovich's claims, the Court observes that Mrs. Vuksanovich alleges a critical fact that is conspicuously absent from Mrs. Salvatore's pleadings: the transience of her earlier symptoms. Unlike Mrs. Salvatore, Mrs. Vuksanovich does not allege that the symptoms she suffered prior to October 2017 "progressively worsened" over time.  Instead, Mrs. Vuksanovich's early symptoms are alleged to have abated, which lends plausibility to her theory that she only discovered the permanent neurological condition for which she now sues within the limitations period.  As such, at this early stage of the proceedings, the Court determines that Mrs. Vuksanovich has pleaded timely personal injury claims.

Defendants contend that Mrs. Vuksanovich's claims accrued on June 16, 2017 — and are thus untimely — because this is the date she first experienced symptoms of toxic fume exposure in connection with a fume event.  (Def. Br. 5-7).  Emphasizing the nexus between this fume event and Mrs. Vuksanovich's

immediate manifestation of acute symptoms, Defendants argue that Section

214-c's tolling rule for latent injuries is inapplicable to her claims.  (*Id.* at 6-7).

Mrs. Vuksanovich protests that Defendants' framing rests on a flawed reading

of her allegations, as she claims to be suing for permanent, debilitating injuries

that were not discoverable more than three years prior to her filing suit.  (Pl.

Opp. 11).  While the Court is hard-pressed to wholly disassociate Mrs.

Vuksanovich's earlier symptoms from her exposure to contaminated air on

Defendants' aircraft, the Court cannot determine as a matter of law based on

her pleadings that she discovered the permanent condition for which she seeks

to recover based on symptoms that dissipated after they appeared.

Mrs. Vuksanovich alleges that on three occasions prior to October 2017,

she developed symptoms while on Defendants' aircraft, some of which

symptoms lingered for up to two weeks following these flights.  The first was on

June 16, 2017, when she experienced a fume event on an Airbus aircraft and

continued to suffer from severe nausea, headaches, burning in her throat,

confusion, severe muscle weakness, fatigue, and anxiety for about a week

thereafter.  (Vuksanovich SAC ¶¶ 53-55).  On July 7, 2017, Mrs. Vuksanovich

developed symptoms while flying on another Airbus aircraft, which symptoms

lingered for approximately two weeks.  (*Id.* at ¶¶ 59-60).  Later that summer, on

August 29, 2017, Mrs. Vuksanovich experienced another fume event on an

Airbus plane, which caused her to experience blurry vision, although she does

not allege any prolonged symptoms following this flight.  (*Id.* at ¶ 65).  Mrs.

Vuksanovich posits that it was not until the fume event she experienced on

October 14, 2017, that her symptoms became permanent, giving her notice of the injuries for which she now sues.  (Pl. Opp. 6-8).

As an initial matter, the Court finds that Section 214-c's tolling provisions applies to claims premised on Mrs. Vuksanovich's permanent condition.  Irrespective of the similarities between the transient symptoms she alleges manifested in the summer of 2017 and the permanent condition she claims to have since developed (*see* Def. Br. 9 (charting Mrs. Vuksanovich's symptoms pre- and post-October 14, 2017)), the Court finds that Mrs. Vuksanovich's *permanent* condition is not alleged to have manifested immediately upon exposure to toxic airplane fumes.  Given this delay, the Court finds that her permanent medical condition is the sort of latent condition that falls within the ambit of Section 214-c(2)'s tolling provision.  *See* C.P.L.R. § 214-c(2) (applying tolling rule to personal injury claims "caused by the *latent* effects of exposure to any substance or combination of substances" (emphasis added)).

The Court appreciates Defendants' point that the Second Amended Complaint does not clearly delineate the onset of Mrs. Vuksanovich's permanent symptoms (Def. Reply 2); however, Defendants proffer too aggressive of an accrual date at this early stage of the proceedings.  For the Court to conclude that Mrs. Vuksanovich discovered or should have discovered her chronic condition on June 16, 2017, the Court must draw a crucial inference against Mrs. Vuksanovich.  In particular, Defendants ask the Court to infer that Mrs. Vuksanovich presaged (or at least should have presaged) the

recurrence of these symptoms even after they abated approximately a week later. This is not a permissible inference for the Court to draw against a plaintiff at the pleading stage. *See Peretti* v. *Authentic Brands Grp. LLC*, 33 F.4th 131, 133 n.1 (2d Cir. 2022) ("For the purpose of a motion to dismiss, this court assumes all facts alleged in the Complaint to be true and draws all reasonable inferences in favor of the plaintiff.").

Defendants additionally argue, in principal reliance on *Bartlett* v. *Moore Business Forms, Inc.*, that neither the alleged worsening of Mrs. Vuksanovich's symptoms, nor the delayed diagnosis of her illness, extends the limitations period. (Def. Br. 8-10 (citing *Bartlett*, 2000 WL 362022)). But the record before the court in *Bartlett* — a summary judgment decision — conclusively determined the untimeliness of the plaintiff's claims, whereas the same cannot be said of Mrs. Vuksanovich's pleadings. In *Bartlett*, the court granted summary judgment in favor of the defendant where the plaintiff was exposed to hazardous toxins at work and began manifesting virtually all of the symptoms of her injuries more than three years prior to the commencement of the action. *Bartlett*, 2000 WL 362022, at *4-7. The record in that case included several pieces of evidence that substantiated the untimeliness of the plaintiff's claims, such as: (i) plaintiff's answers to interrogatories indicating the timing of the onset of her symptoms; (ii) a letter written by plaintiff advising her employer of her symptoms and her intent to initiate a workers' compensation claim; (iii) several reports from plaintiff's treating physician describing her symptoms and theorizing their cause; and (iv) a preliminary diagnosis from another of

24

plaintiff's treating physicians ascribing her symptoms to the toxic effect of fume and vapors.  *Id.* at *2-3.  Equipped with these materials, the court concluded that the plaintiff's early symptoms were not "too isolated or inconsequential" to trigger the statute of limitations.  *Id.* at *4-5.  The court also determined that the subsequent emergence of new symptoms did not constitute a separate and distinct injury to restart the limitations period.  *Id.* at *6-7.

While the Court admits of the possibility that discovery may reveal similar evidence concerning the evolution of Mrs. Vuksanovich's condition, her operative pleadings suggest that the symptoms she suffered in the summer of 2017 were "too isolated or inconsequential" to trigger the limitations period.  *See Wetherill*, 89 N.Y.2d at 514 n.4.  Notably, Mrs. Vuksanovich's allegations of symptoms that pre-date the applicable limitations period lack several of the indicia that New York courts consider in determining whether a plaintiff's symptoms trigger Section 214-c(2) — in other words, that the symptoms are *not* too isolated or inconsequential to trigger the limitations period — such as whether the plaintiff sought medical treatment, whether the plaintiff experienced a persistent limitation of physical activity, and whether the plaintiff filed a workers' compensation claim.  *See In re N.Y.C. Asbestos Litig.*, 39 N.Y.S.3d 629, 634-35 (Sup. Ct. 2016) (noting that the First, Third, and Fourth Departments look to "whether a plaintiff sought regular medical treatment; whether a plaintiff is limited in physical activity or misses time from work; and whether a plaintiff files a workers' compensation claim" to determine the threshold for isolated or inconsequential symptoms).  To this point, Mrs.

Vuksanovich alleges that the symptoms she experienced in June and July 2017 subsided within, at most, two weeks of the flights that set off her symptoms, and there is no indication that her fume-induced blurred vision in August 2017 lasted beyond the duration of that flight.  (Vuksanovich SAC ¶¶ 55, 60, 65).  Moreover, Mrs. Vuksanovich returned to working as a flight attendant after each of these events and she has not alleged that she sought any medical attention prior to November 7, 2017 — which date falls within the limitations period.  (*Id.* at ¶ 81).  As such, the Court cannot conclude as a matter of law from Mrs. Vuksanovich's allegations that she should have discovered the existence of a permanent neurological condition based on symptoms that ceased after a relatively short period of time.  *See, e.g.*, *Malone* v. *Ct. W. Devs., Inc.*, 30 N.Y.S.3d 760, 761-62 (3d Dep't 2016) (finding, on summary judgment, symptoms of mold exposure, such as skin and eye irritation and throat tightness, which ceased when plaintiff left work, to be too isolated or inconsequential to begin statute of limitations); *Castiglione* v. *E.A. Morse & Co.*, 802 N.Y.S.2d 278, 280 (3d Dep't 2005) (determining, on summary judgment, that early exposure symptoms were isolated or inconsequential where plaintiff did not miss any work, file a workers' compensation claim, or submit an injury report); *O'Halloran* v. *345 Park Co.*, 675 N.Y.S.2d 55, 55 (1st Dep't 1998) (deeming, on summary judgment, early symptoms to be isolated or inconsequential where plaintiff missed only two and a half days of work, never sought medical attention, and did not file a workers' compensation claim).

Accordingly, the Court concludes that Mrs. Vuksanovich's claims are not time-barred. Notwithstanding this conclusion, the Court underscores that Defendants are not foreclosed from renewing their timeliness arguments at a later stage in the proceedings on a more fully developed record.

### b.    Mr. Vuksanovich's Claims

Defendants additionally argue that even if Mrs. Vuksanovich's claims are timely, Mr. Vuksanovich's derivative claims are still untimely because his claims were not added until February 8, 2021, and do not relate back to Mrs. Vuksanovich's timely-filed complaint. (Def. Br. 13-14). Because New York law allows Mr. Vuksanovich's claim to relate back to the original complaint, his derivative claims are also timely.

"An amendment to a pleading relates back to the date of the original pleading when … the law that provides the applicable statute of limitations allows relation back[.]" Fed. R. Civ. P. 15(c)(1)(A). To assess relation back in this context, courts look to "the entire *body* of limitations law" for the "more forgiving principle of relation back." *Hogan* v. *Fischer*, 738 F.3d 509, 518 (2d Cir. 2013) (emphasis in original). Thus, "if the applicable statute of limitations is determined by state law ... courts should assess both the state and federal relation back doctrines and apply whichever law is more generous." *Liverpool* v. *Davis*, 442 F. Supp. 3d 714, 725 (S.D.N.Y. 2020) (quoting *Anderson* v. *City of Mount Vernon*, No. 09 Civ. 7082 (ER) (PED), 2014 WL 1877092, at *2 (S.D.N.Y. Mar. 28, 2014)). "[C]ourts in this District consistently find the New York State relation back rule more generous than the federal provision." *Jiminez* v.

27

*Hartford*, No. 21 Civ. 1039 (NSR), 2022 WL 1567701, at *4 (S.D.N.Y. May 17, 2022) (collecting cases).[4]

Under New York law, Section 203 of the C.P.L.R. governs the relation-back doctrine.  That statute provides that claims added by amendment are "deemed to have been interposed at the time the claims in the original pleading were interposed, unless the original pleading does not give notice of the transactions, occurrences, or series of transactions or occurrences, to be proved pursuant to the amended pleading."  C.P.L.R. § 203(f).  "[T]he salient inquiry is not whether defendant had notice of the claim, but whether, as the statute provides, the original pleading gives 'notice of the transactions [and] occurrences … to be proved pursuant to the amended pleading."  *Giambrone* v. *Kings Harbor Multicare Ctr.*, 961 N.Y.S.2d 157, 159 (1st Dep't 2013).  The doctrine is "[a]imed at liberalizing the strict, formalistic pleading requirements

---

[4]     Federal Rule of Civil Procedure 15(c)(1)(C) governs relation back when an amendment changes the named defendants.  Although Rule 15(c)(1)(C) does not expressly apply to amendments that add a new plaintiff, several courts within this District have found that this rule "also applies to a change of plaintiffs."  *Julian* v. *Metro. Life Ins. Co.*, No. 17 Civ. 957 (AJN) (BCM), 2021 WL 4237047, at *6 (S.D.N.Y. Sept. 1, 2021) (collecting cases), *report and recommendation adopted sub nom. Julian* v. *MetLife, Inc.*, 2021 WL 4710775 (S.D.N.Y. Oct. 7, 2021).  For an amendment that adds a new plaintiff to relate back to the original complaint, the original plaintiff must demonstrate:

> [i] the new plaintiff's claims arise out of the same transaction or occurrence advanced in the original pleading; [ii] the defendant received adequate notice of the new plaintiff's claims so as not to be prejudiced in maintaining a defense on the merits; and [iii] the defendant knew or should have known that, but for a mistake concerning the new plaintiff's identity, the action would have been brought on that party's behalf.

*Levy* v. *U.S. Gen. Acct. Off.*, No. 97 Civ. 4016 (MBM), 1998 WL 193191, at *5 (S.D.N.Y. Apr. 22, 1998), *aff'd*, 175 F.3d 254 (2d Cir. 1999).  As the Court explains, New York courts have not uniformly restricted application of the relation-back doctrine under C.P.L.R. § 203(f) to amendments that add new plaintiffs where the failure to name the additional party was the product of mistaken identity in the first instance.

of the [nineteenth] century, while at the same time respecting the important
policies inherent in statutory repose," and "enables a plaintiff to correct a
pleading error — by adding either a new claim or a new party — after the
statutory limitations period has expired." *O'Halloran* v. *Metro. Transp. Auth.*,
60 N.Y.S.3d 128, 131 (1st Dep't 2017) (quoting *Buran* v. *Coupal*, 87 N.Y.2d
173, 177 (1995)).  It is within courts' "sound judicial discretion to identify cases
that justify relaxation of limitations strictures ... to facilitate decisions on the
merits if the correction will not cause undue prejudice to the plaintiff's
adversary." *Id.* (quoting *Buran*, 87 N.Y.2d at 178).

The Court finds that New York law permits the relation back of Mr.
Vuksanovich's claims.  Indeed, at least two New York courts have found later-
added claims to relate back in circumstances similar to Mr. Vuksanovich's.
*See, e.g.*, *Giambrone*, 961 N.Y.S.2d at 158-59 (permitting relation back of
spouse's late-added loss-of-consortium claim in medical malpractice action
where defendant was on notice of the underlying transaction); *Anderson* v.
*Carney*, 557 N.Y.S.2d 575 (3d Dep't 1990) (allowing relation back of spouse's
derivative claim for loss of consortium in personal injury action where spouse's
claim was grounded on the same liability asserted in the original complaint).
Mr. Vuksanovich's loss-of-consortium claim is grounded on the same theory of
liability as his wife's, which means that from the outset of the litigation
Defendants have had "sufficient knowledge to motivate the type of litigation
preparation and planning needed to defend against the entirety of the
particular plaintiff's situation." *Giambrone*, 961 N.Y.S.2d at 159 (citation

29

omitted).  Thus, the underlying complaint put Defendants on notice of the transactions or occurrences that form the basis of his claims.  Because Defendants were not prejudiced by the addition of Mr. Vuksanovich's derivative claims, relation back is appropriate under New York law.  *See id.* (explaining that a defendant's "exposure to greater liability" does not defeat application of the relation-back doctrine under Section 203(f)).  Accordingly, the Court deems Mr. Vuksanovich's derivative loss-of-consortium claim to relate back to the timely filing of the underlying complaint.

## C.   Strict Products Liability and Negligence Claims

Having determined that Mrs. Vuksanovich's personal injury claims are timely, the Court next discusses whether she has adequately pleaded claims for strict products liability and negligence.  Mrs. Vuksanovich seeks to hold Defendants liable for the defective design of the bleed air system in the A320 family of aircraft, as well as Defendants' failure to warn users of the risks associated with the bleed air system on these planes.[5]  As explained below, the Court concludes that Mrs. Vuksanovich's strict products liability and negligence claims survive under both design-defect and failure-to-warn theories.

---

[5]     Because New York law views products liability claims premised on strict liability and negligence as functionally equivalent, the Court assesses these theories together.  *See Simon* v. *Smith & Nephew, Inc.*, 990 F. Supp. 2d 395, 406 (S.D.N.Y. 2013) ("New York courts generally consider strict products liability and negligence claims to be functionally synonymous."); *see also SUEZ Water N.Y. Inc.* v. *E.I. du Pont de Nemours & Co.*, — F. Supp. 3d —, No. 20 Civ. 10731 (LJL), 2022 WL 36489, at *31 (S.D.N.Y. Jan. 4, 2022) ("[F]ailure-to-warn claims grounded in strict liability and negligence are functionally equivalent"); *Colon ex rel. Molina* v. *BIC USA, Inc.*, 199 F. Supp. 2d 53, 83 (S.D.N.Y. 2001) ("[F]or the purposes of analyzing a design defect claim, the theories of strict liability and negligence are virtually identical.").

### 1.   Mrs. Vuksanovich Has Adequately Stated Failure-to-Warn Claims

Mrs. Vuksanovich first brings failure-to-warn claims on the basis that Defendants failed to adequately warn users of their aircraft about the potential hazards associated with the bleed air system.  (Vuksanovich SAC ¶¶ 103, 115, 149, 161).  "[A] plaintiff may recover in strict products liability or negligence when a manufacturer fails to provide adequate warnings regarding the use of its product."  *Rastelli* v. *Goodyear Tire & Rubber Co.*, 79 N.Y.2d 289, 297 (1992).  "In order to recover under a failure to warn theory, a claimant must show: '[i] that a manufacturer has a duty to warn; [ii] against dangers resulting from foreseeable uses about which it knew or should have known; and [iii] that the failure to do so was the proximate cause of harm.'"  *SUEZ Water N.Y. Inc.* v. *E.I. du Pont de Nemours & Co.*, — F. Supp. 3d —, No. 20 Civ. 10731 (LJL), 2022 WL 36489, at *31 (S.D.N.Y. Jan. 4, 2022) (quoting *Quintana* v. *B. Braun Med., Inc.*, No. 17 Civ. 6614 (ALC), 2018 WL 3559091, at *5 (S.D.N.Y. July 24, 2018)).  "This duty is a continuous one, and requires that a manufacturer be aware of the current information concerning the safety of its product."  *Roman* v. *Sprint Nextel Corp.*, No. 12 Civ. 276 (VEC), 2014 WL 5026093, at *13 (S.D.N.Y. Sept. 29, 2014) (quoting *Bee* v. *Novartis Pharms. Corp.*, 18 F. Supp. 3d 268, 283 (E.D.N.Y. 2014)).

Defendants first argue that Mrs. Vuksanovich's failure-to-warn claim fails because she has not adequately alleged that Defendants knew or should have known that the bleed air system on their commercial aircraft posed a risk of injuries of the type suffered by Mrs. Vuksanovich.  (Def. Br. 16-17).  But this

31

argument ignores the import of Mrs. Vuksanovich's allegations.  Mrs. Vuksanovich provides detailed allegations concerning the operation of the bleed air system, including that the bleed air that is circulated throughout the passenger cabin is used to pre-pressurize the hydraulic systems, which systems are prone to leaks or ruptures that release toxic hydraulic fluid into the air.  (Vuksanovich SAC ¶¶ 26-34).  Given these basic features of the bleed air system, the system's interaction with other components of Airbus aircraft, and Mrs. Vuksanovich's allegation that Airbus aircraft have repeatedly experienced fume events that cause levels of airborne toxicants to spike (*id.* at ¶ 32), it is not a stretch to suggest that Defendants knew or should have known of the risks posed by the bleed air system.

Mrs. Vuksanovich additionally alleges that several government publications put Defendants on notice of the dangers of bleed air and fume events well before the injuries alleged in the Second Amended Complaint. (Vuksanovich SAC ¶¶ 90-93).  For instance, in 1999, the Federal Aviation Administration ("FAA") reviewed data from the aviation Accidents and Incident Data System and found 240 events involving air quality issues, 60 of which involved "airplane ventilation toxic contaminant events."  (*Id.* at ¶¶ 92-93). Moreover, according to an FAA's Aerospace Medicine Technical Report published in November 2015, air quality in the cockpit and cabin during air transportation "is critically important to human health" and "[f]or more than 30 years, the topic of cabin air quality has been of concern."  (*Id.* at ¶ 90).  Given the allegations of recurrent fume events on Airbus aircraft, combined with the

allegations of governmental attention directed at this issue for decades, the Court finds it plausible to infer that Defendants were aware — or at least should have been aware — of the risks posed by contaminated air on Airbus passenger aircraft.

Defendants next argue that Mrs. Vuksanovich's allegations prove that she would not have heeded any warning since she flew on an Airbus aircraft in June 2019, years after she developed her condition. (Def. Br. 17-18). This argument fails because such a conclusion is not warranted at the pleading stage of this case. Under New York law, for a failure to warn to proximately cause an injury, "a plaintiff has the obligation to adduce proof that had a warning been provided, she would have read the warning and heeded it." *Mulhall* v. *Hannafin*, 841 N.Y.S.2d 282 (1st Dep't 2007) (citation omitted). New York law also provides for "a presumption that a user would have heeded warnings if they had been provided," which presumption "can be rebutted by proof that an adequate warning would have been futile since plaintiff would not have read it." *Figueroa* v. *W.M. Barr & Co., Inc.*, No. 18 Civ. 11187 (JGK), 2020 WL 5802196, at *5 (S.D.N.Y. Sept. 29, 2020) (quoting first *Santoro ex rel. Santoro* v. *Donnelly*, 340 F. Supp. 2d 464, 486 (S.D.N.Y. 2004), then *Anderson* v. *Hedstrom Corp.*, 76 F. Supp. 2d 422, 441 (S.D.N.Y. 1999)). Mrs. Vuksanovich's allegations do not defeat this presumption and, in fact, can be understood to support her position that she would have complied with an adequate warning if Defendants had provided one. On this generous reading, just as Mrs. Vuksanovich heeded the warnings of her doctors by fully

complying with the strict medical protocols that her doctors provided to take a flight, so too would she have heeded a warning concerning the dangers present on Defendants' aircraft.  (Vuksanovich SAC ¶¶ 78-79).  Irrespective of the best reading of Mrs. Vuksanovich's allegation concerning her June 2019 flight, the Court may not draw such an inference against Mrs. Vuksanovich at this stage of the proceedings.  In this regard, all of the decisions Defendants cite in support of a contrary outcome were issued at later stages of the proceedings, with more fully developed factual records, and are thus inapt.[6]  Accordingly, Mrs. Vuksanovich has adequately pleaded strict liability and negligence claims for Defendants' failure to warn of the dangers associated with their A320 line of aircraft.

### 2.   Mrs. Vuksanovich Has Adequately Stated Design-Defect Claims

Mrs. Vuksanovich also asserts strict products liability and negligence claims on the theory that Defendants placed a dangerous and defective product into the stream of commerce.  (Vuksanovich SAC ¶¶ 98-102, 113-114, 145-148, 159-160).  Under New York law, "[a] defectively designed product is one which, at the time it leaves the seller's hands, is in a condition not reasonably contemplated by the ultimate consumer and is unreasonably dangerous for its intended use, and whose utility does not outweigh the danger inherent in its introduction into the stream of commerce."  *Hoover* v. *New Holland N. Am., Inc.*,

---

[6]     *See Castorina* v. *A.C. & S.*, 49 N.Y.S.3d 238 (Sup. Ct. 2017) (motion for a directed verdict); *Zapata* v. *Ingersoll Rand Co.*, 959 N.Y.S.2d 93 (Sup. Ct. 2012) (motion for summary judgment); *Burke* v. *Spartanics, Ltd.*, 252 F.3d 131, 134 (2d Cir. 2001) (post-trial appeal); *Raney* v. *Owens-Ill., Inc.*, 897 F.2d 94, 95 (2d Cir. 1990) (post-trial appeal).

23 N.Y.3d 41, 53-54 (2014) (quoting *Voss* v. *Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 107 (1983)).  To establish a design defect, a plaintiff must allege "[i] that the product, as designed, posed a substantial likelihood of harm; [ii] that it was feasible for the manufacturer to design the product in a safer manner; and [iii] that the defective design was a substantial factor in causing plaintiff's injury." *In re Sears Holdings Corp.*, 628 B.R. 402, 411 (S.D.N.Y. 2021) (quoting *Am. Guarantee & Liab. Ins. Co.* v. *Cirrus Design Corp.*, No. 09 Civ. 8357 (BSJ) (HBP), 2010 WL 5480775, at *3 (S.D.N.Y. Dec. 30, 2010)).

Defendants first challenge the sufficiency of Mrs. Vuksanovich's allegations concerning the feasibility of an alternative design for Defendants' aircraft.  (Def. Br. 18-19).  Defendants argue that under New York law, the time frame for gauging the feasibility of an alternative design is restricted to the date the alleged defective product was manufactured — here, approximately 1999 (Vuksanovich SAC ¶ 47) — and thus that Mrs. Vuksanovich's allegations concerning Boeing's launch of a commercial aircraft without a bleed air system in 2004 is irrelevant (*id.* at ¶¶ 95-96).  (Def. Br. 18-19).  This argument rests on a misapplication of New York law.

Defendants cite the New York Court of Appeals' decision in *Cover* v. *Cohen*, 61 N.Y.2d 261 (1984), as establishing "the date of manufacture as the critical time" for evidence of feasibility in a design-defect case.  (Def. Br. 18).  Contrary to Defendants' contention, however, *Cover* does not establish in design-defect cases a categorical bar on the introduction of evidence of a feasible alternative design that post-dates the manufacturing of an allegedly

defective product.  Rather, the Court of Appeals in *Cover* considered the
admissibility of a narrower category of evidence in design-defect products
liability actions, namely "postmanufacture changes in design" to an allegedly
defective product.  *Cover*, 61 N.Y.2d at 267, 270-71.  The Court of Appeals held
that

> [s]uch evidence *may be* admissible in [a design-defect
> case] to establish feasibility, but, in view of the
> abstruse, subjective judgment involved in the balancing
> of risks and benefits necessary to determine whether
> the product as made and sold was reasonably safe, and
> the substantial risk that such evidence may be
> overemphasized by the jury, will not be admitted even
> for that purpose *if the manufacturer concedes feasibility.*

*Id.* at 270 (emphases added) (internal citations omitted).  Here, Defendants
clearly do not concede feasibility.  Furthermore, Mrs. Vuksanovich does not
allege that Defendants implemented *any* postmanufacture change to their
aircraft, let alone one serving as evidence of a defect in Defendants' product.

In sum, New York law does not prohibit Mrs. Vuksanovich from averring
that Boeing's implementation of a bleed-free air supply system in commercial
aircraft as soon as 2004 suggests that Defendants could have adopted a similar
design.  Indeed, the Court views Boeing's design, as well as Mrs. Vuksanovich's
specific allegation that Defendants could have implemented a system that used
electrically driven compressors to feed fresh air through dedicated cabin air
inlets (Vuksanovich SAC ¶ 34), as competent allegations to support the
existence of a reasonable alternative design for the A320 family of airplanes.

Lastly, Defendants argue that Mrs. Vuksanovich's design-defect claims
fail because she has not pleaded any allegations that demonstrate Defendants'

knowledge of a defect in the A320 line of aircraft that could cause injuries of the type alleged. (Def. Br. 19-21). Again, this argument rests on a flawed application of New York law. A defendant's knowledge of the possible consequences of a defect is not a requirement to state a strict products liability claim based on a design defect under New York law. *See Voss*, 59 N.Y.2d at 107 ("A manufacturer is held liable regardless of his lack of actual knowledge of the condition of the product because he is in the superior position to discover any design defects and alter the design before making the product available to the public. Liability attaches when the product, as designed, presents an unreasonable risk of harm to the user."). Rather, a *prima facie* case for strict products liability based on a design defect requires a plaintiff to establish only that a "manufacturer breached its duty to market safe products when it marketed a product designed so that it was not reasonably safe and that the defective design was a substantial factor in causing plaintiff's injury." *Adams* v. *Genie Indus., Inc.*, 14 N.Y.3d 535, 542 (2010) (quoting *Voss*, 59 N.Y.2d at 107). Nor are allegations of knowledge necessary to make out a claim for negligence based on a design defect, as "[t]he New York Court of Appeals has ... made it clear that the [design-defect] standards set forth in [*Voss*] apply to both strict liability and negligence claims." *Ulloa* v. *Takata Corp., TK Holdings Inc.*, No. 16 Civ. 6225 (KMW) (BCM), 2017 WL 1194691, at *3 (S.D.N.Y. Mar. 30, 2017) (internal quotation marks omitted); *see also Adams*, 14 N.Y.3d at 543 ("[W]hile plaintiff here has pleaded both strict liability and negligent design

causes of action, the standards set forth in *Voss* apply to both.").[7]  Therefore,

the Court rejects Defendants' argument that Mrs. Vuksanovich's design-defect

claims are inadequately pleaded for failure to allege facts demonstrating

Defendants' knowledge.[8]

    For the reasons just stated, Mrs. Vuksanovich has adequately alleged

claims for strict products liability and negligence based on the allegedly

defective design of Defendants' A320 aircraft.

## D.    Warranty Claims

    Lastly, Mrs. Vuksanovich alleges that Defendants breached both an

express warranty and the implied warranty of merchantability by designing,

marketing, and selling defective aircraft that were not reasonably safe for their

intended use.  (Vuksanovich SAC ¶¶ 108-111, 154-157).  As discussed below,

Mrs. Vuksanovich has not stated a claim for breach of express warranty, but

has stated a claim for breach of the implied warranty of merchantability.

---

[7]    The New York Court of Appeals has acknowledged that despite its earlier efforts to distinguish strict products liability cases from those based on the allegedly negligent design of products, "that line-drawing effort had not been successful."  *Adams* v. *Genie Indus., Inc.*, 14 N.Y.3d 535, 542-43 (2010).  The Court of Appeals now endorses the view that "in general, the strict liability concept of 'defective design' is functionally synonymous with the earlier negligence concept of unreasonable designing."  *Id.* (internal alterations and citation omitted).  Thus, for claims premised on strict products liability or negligence, "[t]he decisive question is whether plaintiff has produced enough evidence for a jury to find that [a defendant's] product ... was 'not reasonably safe' as *Voss* defines the term."  *Id.*  The logic of the Court of Appeals confirms that a defendant's knowledge of the risks attendant with a particular design does not factor into the analysis of design-defect claims.

[8]    Even if allegations of knowledge were a requirement to make out Mrs. Vuksanovich's claims based on the defective design of the A320 family of airplanes, the Court concludes that the FAA investigation and publications concerning cabin air quality plausibly give rise to the inference that Defendants at least should have been aware of the risks associated with their bleed air system.  (*See* Vuksanovich SAC ¶¶ 90-93).

### 1.    Mrs. Vuksanovich Has Failed to State a Claim for Breach of Express Warranty

An express warranty is an "affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." N.Y.U.C.C. § 2-313(1)(a). "Privity is normally an essential element of a cause of action for express warranty, but the U.C.C. includes a personal injury exception" that extends a warranty to reasonably foreseeable users of a product who have been injured by a breach of the warranty. *DiBartolo* v. *Abbott Lab'ys*, 914 F. Supp. 2d 601, 624-25 (S.D.N.Y. 2012) (internal quotation marks and citations omitted).[9] Here, Mrs. Vuksanovich does not allege that she was in privity with Defendants, but the Court finds that Defendants could reasonably expect that, as a flight attendant, she would use or be affected by their aircraft. (*See* Vuksanovich SAC ¶ 2).

"To state a claim for breach of express warranty, plaintiff must allege that there was an affirmation of fact or promise by the seller, the natural tendency of which was to induce the buyer to purchase and that the warranty was relied upon to the plaintiff's detriment." *DiBartolo*, 914 F. Supp. 2d at 625 (internal quotation marks and citation omitted); *see also Reed* v. *Pfizer*, 839 F. Supp. 2d 571, 578 (E.D.N.Y. 2012) ("A successful claim of a breach of express warranty requires proof that an express warranty existed, was breached, and that plaintiff had relied on that warranty."). Generalized or vague allegations

---

[9]    Section 2-318 of the New York Uniform Commercial Code provides: "A seller's warranty whether express or implied extends to any natural person if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty."

that a defendant made express warranties are insufficient; a plaintiff must "plead some affirmative statement of fact that forms the basis of the warranty." *Cowan* v. *Costco Wholesale Corp.*, No. 15 Civ. 5552 (PKC), 2017 WL 59080, at *5 (E.D.N.Y. Jan. 5, 2017).

Here, Mrs. Vuksanovich has failed to allege facts sufficient to sustain an express warranty claim.  Nowhere in her Second Amended Complaint does Mrs. Vuksanovich assert any "affirmation of fact," or, for that matter, any representation whatsoever, made by Defendants concerning their allegedly defective aircraft for anyone to have relied upon.  Mrs. Vuksanovich argues that federal law requires Defendants to make express warranties to purchasers whenever they sell or deliver an aircraft (Pl. Opp. 22); however, this allegation appears nowhere in the Second Amended Complaint, and thus cannot stand as the basis upon which her express warranty claim stands.  *See, e.g., Goldin* v. *Smith & Nephew, Inc.*, No. 12 Civ. 9217 (JPO), 2013 WL 1759575, at *6 (S.D.N.Y. Apr. 24, 2013) (dismissing breach of express warranty claim where plaintiff "has not alleged with sufficient specificity the requisite representation by [defendant]").  Accordingly, the Court dismisses Mrs. Vuksanovich's breach of express warranty claim.

### 2.    Mrs. Vuksanovich Has Adequately Stated a Claim for Breach of the Implied Warranty of Merchantability

Although Defendants have not expressly moved to dismiss Mrs. Vuksanovich's implied warranty claim on the basis that it is inadequately pleaded, this claim merits a brief discussion.  A manufacturer may be held liable under New York law for breach of implied warranty of merchantability

40

when its products are not "fit for the ordinary purposes for which such goods are used." N.Y.U.C.C. § 2-314(2)(c); *see also Saratoga Spa & Bath* v. *Beeche Sys. Corp.*, 656 N.Y.S.2d 787, 789 (3d Dep't 1997). "As with a claim for breach of express warranty, privity is normally required for a claim for breach of implied warranty, though the U.C.C.'s personal injury exception applies here as well." *DiBartolo*, 914 F. Supp. 2d at 627 (citing N.Y.U.C.C. § 2-318).

"To state a claim for a breach of the implied warranty of merchantability, plaintiff must allege [i] that the product was defectively designed or manufactured, [ii] that the defect existed when the manufacturer delivered the product to the purchaser, and [iii] that the defect is the proximate cause of the plaintiff's injury." *Tears* v. *Bos. Sci. Corp.*, 344 F. Supp. 3d 500, 513 (S.D.N.Y. 2018) (citation omitted). "The facts required to demonstrate a breach of the implied warranty of merchantability are thus very similar as those needed to support a strict products liability claim." *Id.* (collecting cases).

Here, for substantially the same reasons that Mrs. Vuksanovich has pleaded sufficient facts to state a claim for strict products liability based on a design defect, she has also stated a claim for breach of the implied warranty of merchantability. Mrs. Vuksanovich has adequately alleged that the A320 family of aircraft, manufactured by Defendants, were defectively designed because the bleed air system exposed people in the passenger cabin to unreasonably high levels of airborne toxicants, and that this defect existed at the time the aircraft was delivered to the purchaser. (*See* Vuksanovich SAC ¶¶ 24-34). Furthermore, Mrs. Vuksanovich has alleged that this defect was the

41

proximate cause of her injuries. (*Id.* at ¶¶ 35, 81-88). Therefore, Mrs. Vuksanovich has adequately stated a claim for breach of the implied warranty of merchantability.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART. Defendants' motion to dismiss is granted as to all claims asserted against Defendant Airbus Americas Engineering, Inc., which was not an independent legal entity at the time these actions were initiated. Defendants' motion to dismiss is also granted with respect to all claims asserted by Mr. and Mrs. Salvatore because they are time-barred. Moreover, Defendants' motion to dismiss is granted as to Mrs. Vuksanovich's claim for breach of express warranty. Defendants' motion is denied as to all other claims asserted by Mr. and Mrs. Vuksanovich.

Defendants are ordered to file an Answer to the Second Amended Complaint in *Vuksanovich* by July 8, 2022. The parties are further ordered to file a joint status letter regarding the next steps in this case and a proposed case management plan on or before July 22, 2022.

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close the *Salvatore* action, 21 Civ. 3487. The Clerk of Court is further directed to terminate the pending motion at docket entry 74 in the *Vuksanovich* action, 21 Civ. 3454.

SO ORDERED.

Dated:      June 23, 2022
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

43