UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KRISTI VUKSANOVICH and MARK
VUKSANOVICH,

                                    Plaintiffs,

                 -against-

AIRBUS AMERICAS, INC. and AIRBUS
S.A.S.,

                                    Defendants.

No. 21-CV-3454-LTS-VF

<u>MEMORANDUM OPINION & ORDER</u>

Plaintiff Kristi Vuksanovich and her spouse, Plaintiff Mark Vuksanovich

("Plaintiffs"),[1] bring this action against Defendants Airbus Americas, Inc. and Airbus S.A.S.

(collectively, "Airbus" or "Defendants").  Ms. Vuksanovich asserts causes of action for strict

products liability, negligence, and breach of implied warranty of merchantability.  She alleges

that she has suffered short-term and long-term health effects arising from "'fume' events which

occur[red] as a result of the defective design and manufacture of Defendants' aircraft," exposing

Ms. Vuksanovich to toxic cabin fumes while she served as a JetBlue flight attendant aboard

Airbus's aircraft.  (Docket entry no. 49 ("SAC") ¶¶ 25, 87-89.)  Mr. Vuksanovich asserts

derivative claims against Defendants for damages based on loss of consortium.

Pending before the court are Defendants' motions, pursuant to Federal Rule of

Civil Procedure 56, for summary judgment dismissing all of Plaintiffs' claims on statute of

limitations grounds (docket entry no. 124), and for failure to state a claim upon which relief may

be granted (docket entry no. 194).  Also pending are five motions to preclude testimony brought

---

[1]    One June 23, 2022, Judge Katherine Polk Failla dismissed all claims brought by plaintiffs
       Amysue Salvatore and Michael F. Salvatore as time-barred.  (Docket entry no. 79.)

AIRBUS – MSJ                      SEPTEMBER 30, 2025                           1

by Defendants pursuant to Rules 702 and 705 of the Federal Rules of Evidence. (Docket entry nos. 189, 190, 191, 192, 193.) The Court has jurisdiction of this action pursuant to 28 U.S.C. section 1332.

The Court has considered the parties' submissions and arguments carefully. For the reasons explained below, Defendants' first motion for summary judgment is granted. Because all of Plaintiffs' claims are time-barred, the Court does not rule on Defendants' second motion for summary judgment or on Defendants' motions to preclude. There is also no need for oral argument, and Defendants' motion for argument (docket entry no. 204) is therefore denied.

## BACKGROUND

The following facts are undisputed unless otherwise indicated.[2] Defendants' A320 family of aircraft utilizes a "bleed air" system to pressurize and condition cabin air; this type of system is used in 97 percent of the world's commercial passenger jet fleet. (Docket entry no. 224-1 ("Def. Reply to Pl. Second 56.1 Resp.") ¶ 4). The bleed air system draws compressed air from an aircraft's engine and pumps it into the passenger cabin. (Id. ¶ 6). Air is ingested from the environment into the Auxiliary Power Unit ("APU") inlet; in the Airbus A320 aircraft, the APU inlet is located at the bottom of the aircraft's fuselage, downstream of the jet engines. (Docket entry no. 224-2 ("Def. Reply to Pl. 56.1 St. of Addt'l Facts") ¶¶ 108-109.) This location

---

[2]    Facts characterized as undisputed are identified as such in the parties' statements pursuant to S.D.N.Y. Local Civil Rule 56.1, or drawn from evidence as to which there has been no contrary, non-conclusory factual proffer. Citations to Local Civil Rule 56.1 Statements (docket entry nos. 126 ("Def. 56.1 St."), 142 ("Pl. 56.1 Resp."), 192 ("Def. Second 56.1 St."), 210-1 ("Pl. Second 56.1 Resp."), 210-2 ("Pl. 56.1 St. of Addt'l Facts"), 224-1 ("Def. Reply to Pl. Second 56.1 Resp."), 224-2 ("Def. Reply to Pl. 56.1 St. of Addt'l Facts.")) incorporate by reference the parties' citations to the underlying evidentiary submissions.

can allow oil leaks and drainage from the APU, as well as hydraulic fluids from forward areas of the aircraft, to enter the APU air intake and contaminate breathing air supply on the aircraft.  (Id. ¶ 116.)

Bleed air can be contaminated with jet engine oil, hydraulic fluids, and deicing agents, including neurotoxic jet engine oil decomposition products such as tricresyl phosphate ("TCP"), tri-ortho-cresyl phosphate ("TOCP"), and other neurotoxic isomers that are present in jet engine oil vapors.  (Id. ¶¶ 101-102.)  While Defendants dispute whether these contaminants are ever present in high enough concentrations in bleed air to be harmful to human health (id. ¶¶ 99, 101), it is undisputed that bleed air contamination can lead to health effects for crew such as headaches, dizziness, and eye nose or throat irritation (id. ¶ 158 (admitting the authenticity of an internal Airbus report from 2011 that "concluded that bleed air contamination in the cabin can lead to several health effects for crew . . . [that] should be considered major" but disputing "any characterization suggesting that these physiological effects are harmful to 'health.'").)  The parties also dispute whether bleed air is filtered before entering the cabin on A320 aircraft.  (Id. ¶ 109.)

Fume events, where higher concentrations of contaminants are present in bleed air, occur on Airbus aircraft, often accompanied by odors similar to those of dirty socks or smoke.  (Id. ¶¶ 104, 106.)  Consequently, fume events are sometimes also described as cabin odor events.  Airbus has identified external and internal oil leakages and the APU's ingestion of external fumes, external pollutants, hydraulic leaks, air conditioning fluid, and deicing fluid as sources of cabin odor events on A320 aircraft.  (Id. ¶¶ 122, 135.)  According to Airbus's internal tracking, oil leaks emanating from the APU were the main cause of cabin odors and related "out of service" events for Airbus aircraft in JetBlue's fleet in 2017 and Delta Airlines' fleet in 2018.

(Id. ¶ 134, 145.)  Airbus A320F aircraft experience more cabin odor events traceable to the APU

than other comparable aircraft except the MD80, a McDonnell-Douglass aircraft.  (Id. ¶ 140.)

An expert witness retained by Defendants testified that it would be reasonable to conclude that

every airline utilizing an A320 aircraft has reported to Airbus that, at least once, a crew

member's injury or a service disruption was allegedly a result of a contaminated cabin air event.

(Id. ¶ 148.)

   Ms. Vuksanovich, a former JetBlue flight attendant, has flown on several A320

aircraft designed, manufactured, and assembled by Defendants.  (SAC ¶¶ 10-14; docket entry

no. 142 ("Pl. 56.1 Resp.") ¶ 1.)  Beginning on June 16, 2017, she experienced myriad short-term

and long-term symptoms of illness, some coinciding with alleged fume events she experienced

while on Defendants' aircraft (Pl. 56.1 Resp. ¶¶ 10-11, 16, 18, 20, 22, 26-27, 30-31, 40, 42, 46,

48, 51-52, 77), while others arose without any apparent connection to a fume event (id.

¶¶ 84-85).  Prior to June 16, 2017, Ms. Vuksanovich knew of a JetBlue pilot who had become ill

as a result of cabin odors.  (Docket entry no. 127-1 ("Vuksanovich Deposition") at 47:5-21).)

   Ms. Vuksanovich's earliest symptoms manifested on June 16, 2017, during a

round-trip flight between Boston and Dallas-Fort Worth.  (Pl. 56.1 Resp. ¶¶ 5-12, 16-17.)

During the pre-flight safety briefing, she and the crew were "informed that the aircraft ha[d]

experienced issues with severe 'cabin odors,' in reality being toxic fumes, of the stinky sock; wet

dog smell" and that the aircraft was delayed due to maintenance issues.  (Docket entry

no. 197-14 ("Howard Report") [3] at 4-6 (quoting Ms. Vuksanovich's testimony).)  Upon boarding

---

[3]  While parties contest the admissibility of the Howard Report, because their contentions
focus on what expert opinions Dr. Howard may offer, the Court relies on Ms.
Vuksanovich's account, documented therein, of what she experienced during the fume
events.

the aircraft in Boston, Ms. Vuksanovich noticed an odor in the cabin that smelled like dirty socks. (Pl. 56.1 Resp. ¶ 7.) Upon landing in Dallas, Ms. Vuksanovich called her husband and told him that her "throat felt like it was sunburned." (Id. ¶ 8.) On the return flight to Boston, the same smell persisted, and Ms. Vuksanovich experienced a headache, sore throat, and stomach pain. (Id. ¶¶ 9-10.) She also recalls reading an email from JetBlue during the return flight that addressed the airline's efforts to "fix" cabin fume events and provided information about whom to contact if a person experienced symptoms after smelling cabin orders. (Vuksanovich Deposition at 45:10-46:16, 48:12-49:23; docket entry no. 127-7, at 2; Howard Report 4-6.) Following the flight, Ms. Vuksanovich continued to suffer from a sore throat and gastrointestinal symptoms; she also experienced "severe muscle weakness and debilitation," "trouble breathing," fatigue, "severe unexplained anxiety," coordination problems, issues with neuropathy, speech issues, and cognitive issues including confusion and memory loss. (Pl. 56.1 Resp. ¶¶ 11, 18.) Although Plaintiffs allege in their complaint that these symptoms subsided after approximately one week (SAC ¶ 55), Plaintiffs admitted as discovery progressed that some symptoms persisted for "days" after the flight while others continued with no clear end date (compare Def. Reply to Pl. Second 56.1 Resp. ¶ 16 (experienced cough, muscle weakness, and gastrointestinal problems "in the days after the flight"), with id. ¶ 17 (experienced cognitive symptoms including confusion, headache, and memory loss "after the June 16 flight"). Ms. Vuksanovich did not return to work until nine days after the June flight. (Pl. 56.1 Resp. ¶ 13.) Her ability to perform household duties and engage in romantic and social relationships was also affected, becoming limited. (Id. ¶¶ 14-15.) Ms. Vuksanovich recalls feeling "perfectly fine" before boarding another flight several weeks later, on July 7, 2017. (Id. ¶ 25.)

On July 7, 2017, Ms. Vuksanovich worked a flight from Los Angeles to Boston and experienced similar symptoms, though she did not smell any unusual odors. (Id. ¶¶ 24, 26.) During the flight, she experienced headache, sore throat, stomach pain, nausea, itchy eyes, and a nosebleed. (Id. ¶ 26.) Following the flight, she continued to suffer from headaches and stomach pain; she also experienced other gastrointestinal symptoms, muscle weakness, fatigue, coordination problems, issues with neuropathy, speech issues, flu-like symptoms, and cognitive issues including confusion and forgetfulness. (Id.) These symptoms continued for two weeks. (Id.) Ms. Vuksanovich did not return to work until eleven days after the July flight. (Id. ¶ 33.) Her ability to perform household duties and engage in romantic and social relationships was once again limited. (Id. ¶¶ 34-36.)

On August 29, 2017, Ms. Vuksanovich worked a flight from Boston to Portland and experienced similar symptoms. (Id. ¶¶ 37, 40.) Before takeoff, Ms. Vuksanovich and another flight attendant smelled smoke but could not locate any source such as a fire; the captain told them it was a "fume event" and that the aircraft, which had had "multiple fume events" prior to that flight, would return to the gate to be serviced. (Id. ¶¶ 38-41.) While waiting for the replacement aircraft to arrive, Ms. Vuksanovich told her supervisor that "she was 'terrified because [she had] already been sick the last two months' and now recognized 'that [she] had been sick . . . every time [she] went to work.'" (Id. ¶ 45 (quoting Vuksanovich Deposition at 140:1-15).) While the aircraft was taxiing before takeoff, Ms. Vuksanovich experienced headache, sore throat, eye irritation, and cough. (Id. ¶ 40.) Following the flight, she continued to suffer from headaches and eye irritation; she also experienced symptoms including dyslexia, muscle weakness, pain, fatigue, anxiety, coordination problems, speech issues, and cognitive issues including confusion and forgetfulness. (Id. ¶¶ 40, 46, 51-52, 54.) On August 30, 2017,

the day after the flight, Ms. Vuksanovich texted another member of the crew, stating that she had woken up with irritation of her left eye that "she attributed to being 'from the fumes.'"  (Id. ¶ 46.)  Ms. Vuksanovich did not return to work until one month after the August flight.  (Id. ¶ 68.)  In August and September 2017, she "remained unable to perform household duties" and her ability to engage in romantic and social relationships was affected.  (Id. ¶ 53.)

On September 1, 2017, Ms. Vuksanovich filed a workplace injury claim with JetBlue's workers' compensation insurer, sending photos of her irritated eye.  (Id. ¶ 54.)  On the same day, Ms. Vuksanovich visited an emergency room at the direction of a workers' compensation representative; there, she told doctors that she had been "exposed to fumes" including "tricresyl phosphate."  (Id. ¶¶ 57-59.)  For purposes of preparing an April 2018 workers' compensation report, Ms. Vuksanovich later told her primary care physician, Dr. Frances Caparo, that she "'inhaled fumes as a flight attendant' on '6/16/2017,' and that the symptoms for which she was seeking workers' compensation payment first appeared on that day."  (Id. ¶ 21 (quoting docket entry no. 129-14, at 50:10-15, 56:10-15).)

Ms. Vuksanovich's final flight as a JetBlue flight attendant was on October 14, 2017; on October 15, 2017, she was deemed disabled for purposes of Social Security Disability Insurance and ceased working.  (Id. ¶¶ 73-75, 77.)  Ms. Vuksanovich testified that she did not "'observe' any fume or smoke or odor events" on the October flight, but she did experience symptoms after the flight that were similar to those she experienced after prior flights with fume events. (Id. ¶¶ 80, 84.)  As a passenger, Ms. Vuksanovich took a flight on June 25, 2019, on which she did not observe any fumes or odors but did experience chest tightness, trouble breathing, and rapid heartrate.  (Id. ¶¶ 85-87.)  Her symptoms have improved since October 2017, but they have not abated.  (Id.)

Ms. Vuksanovich began seeking medical treatment in June 2017.  (Id. ¶ 16.)  Ms. Vuksanovich also underwent "weekly" medical testing and saw "specialized physicians."  (Id.) She visited her primary care physician, Dr. Frances Caparo, after the July and August 2017 flights.  (Id. ¶¶ 30, 48.)  She later told several medical providers that she "had symptoms for the first time" on June 16, 2017, and one neuro-rehabilitative healthcare provider listed Ms. Vuksanovich's date of injury as June 16, 2017 on her discharge form.  (Id. ¶¶ 16, 20-23.)  Ms. Vuksanovich testified that she "definitely was not feeling well and it started on that aircraft [on June 16, 2017] after having that exposure."  (Id. ¶ 11.)  She has been "debilitatingly ill on and off since June 16" which she believes is due to "cabin fumes."  (Id. ¶ 16.)  While it is undisputed that Plaintiff sought medical attention in June 2017 and continued to do so in the months that followed, Ms. Vuksonavich denies that she knew in June 2017 that her symptoms were due to exposure to toxic fumes.  (Docket entry no. 127-3 ¶ 8.)

Ms. Vuksanovich commenced this action in the United States District Court for the District of Massachusetts on October 14, 2020.  (Docket entry no. 1.)  On February 8, 2021, Ms. Vuksanovich filed an amended complaint adding Mr. Vuksanovich as a plaintiff.  (Docket entry no. 10.)  While Defendants' motion to dismiss was pending, Plaintiffs sought transfer to the Southern District of New York on March 8, 2021; the transfer was effectuated on April 20, 2021, and the case was assigned to Judge Katherine Polk Failla.  On October 14, 2021, the Court granted Plaintiffs' unopposed motion to consolidate their case with that of Amysue Salvatore, a former JetBlue flight attendant, and her spouse, Michael L. Salvatore.

On June 23, 2022, the Court ruled on Defendants' consolidated motion to dismiss, granting the motion as to all of Ms. and Mr. Salvatore's claims, which were found time-barred, and as to all claims against Airbus Americas Engineering, Inc., which was not an independent

legal entity at the time the action was initiated.  (Docket entry no. 79 ("MTD Order").)  The

Court also granted the motion to dismiss as to Ms. and Mr. Vuksanovich's claim for breach of

express warranty, finding that Plaintiffs had failed to state a claim upon which relief could be

granted.  (Id.)  The Court denied the motion as to Ms. and Mr. Vuksanovich's claims for strict

products liability, negligence, breach of implied warranty of merchantability, and loss of

consortium.  (Id.)  On July 22, 2022, the Court ordered fact and expert discovery to begin.  On

January 17, 2023, the case was reassigned to Judge Jennifer H. Rearden.  After multiple

extensions, February 16, 2024, was established as the fact discovery cut-off date, and July 31,

2024, was established as the expert discovery cut-off date.

      Defendants moved for summary judgment on statute of limitations grounds on

November 10, 2023.  (Docket entry no. 124.)  In fall 2023, the parties briefed the first motion for

summary judgment. (Docket entry nos. 125 ("Def. Mem."), 126 ("Def. 56.1"), 141 ("Pl. Mem."),

142 ("Pl. 56.1 Resp."), 145 ("Def. Reply"), 149 ("Pl. Sur-Reply"), 152 ("Def. Supp. Mem.").)[4]

During briefing, Plaintiffs raised for the first time executive orders issued by New York's

governor that had suspended statutes of limitations during the COVID pandemic.  (Pl. Mem. at

3-7.)  In response, Defendants raised for the first time N.Y. C.P.L.R. § 202, New York's

borrowing statute, which directs this Court to apply the limitations period of either New York or

the state where the claims accrued, whichever is shorter, where a nonresident plaintiff sues based

on a cause of action accruing outside of New York.  (Def. Reply at 2-4.)  The applicable statute

---

[4]    Discovery continued after filing of the instant motion, but the parties have not moved to supplement any of their pleadings.  While the Court primarily relies on evidentiary submissions filed in support of the first motion for summary judgment (docket entry nos. 126, 142), undisputed facts from the Rule 56.1 statements filed in support of the second motion for summary judgment (docket entry nos. 196, 210, 201-2, 224-1, 224-2), had no material effect on the Court's analysis of the timeliness of these claims.  Insofar as facts raised in these statements are genuinely disputed, none are material.

of limitations law was not contested at the motion to dismiss stage, as both parties had applied N.Y. C.P.L.R. § 214 without consideration of N.Y. C.P.L.R. § 202.

Defendants filed their second motion for summary judgment on all claims on September 6, 2024.  (Docket entry no. 194.)  In fall 2024, the parties briefed the second motion for summary judgment.  (Docket entry nos. 195, 196, 210, 212, 221.)  On September 6, 2024, Defendants also filed motions to preclude the opinions of:  Dr. Susan Michaelis (docket entry nos. 189, 200); Dr. Judith Anderson (docket entry nos. 190, 198); Dr. Vyvyan Howard (docket entry nos. 191, 199); Dr. Dieter Scholz (docket entry nos. 192, 201); and Ms. Vuskanovich's medical providers (docket entry nos. 193, 202).  Plaintiffs filed omnibus opposition papers on October 4, 2024, (docket entry no. 211), to which Defendants replied (docket entry nos. 216, 217, 218, 219, 220).

On April 28, 2025, the case was reassigned to the undersigned.  All seven motions are fully briefed.

<u>DISCUSSION</u>

Summary judgment is to be granted in favor of a moving party "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is considered material if it "might affect the outcome of the suit under the governing law," and an issue of fact is a genuine one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts and they may not rely on conclusory allegations or unsubstantiated

speculation." Caladora v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (citation omitted). The nonmoving party "must offer some hard evidence showing that its version of the events is not wholly fanciful." Golden Pac. Bancorp v. FDIC, 375 F.3d 196, 200 (2d Cir. 2004) (citation omitted). However, in considering a motion for summary judgment, all evidence must be viewed "in the light most favorable to the non-moving party," Nieblas-Love v. N.Y.C. Hous. Auth., 165 F. Supp. 3d 51, 64 (S.D.N.Y. 2016) (citation omitted), and the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003) (citation and quotation marks omitted). Where the party opposing summary judgment "fails to properly address [the moving] party's assertion of fact . . . the Court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

Applicable Law

A federal court sitting in diversity applies the forum state's statute of limitations provisions, as well as any provisions that govern the tolling of the statute of limitations. See Diffley v. Allied-Signal, Inc., 921 F.2d 421, 423 (2d Cir. 1990). In diversity cases in New York, federal courts apply New York's borrowing statute, N.Y. C.P.L.R. § 202. See Cantor Fitzgerald Inc. v. Lutnick, 313 F.3d 704, 710 (2d Cir. 2002) ("To determine which state's law applies, a federal court sitting in diversity must apply the conflict-of-laws rules of the state in which the federal court sits." (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)) (emphasis added)). Under N.Y. C.P.L.R. § 202, "when a nonresident plaintiff sues upon a cause of action that arose outside of New York, the court must apply the shorter limitations period, including all relevant tolling provisions, of either: (1) New York; or (2) the state where the cause of action accrued." Thea v. Kleinhandler, 807 F.3d 492, 497 (2d Cir. 2015) (quoting Stuart v.

Am. Cyanamid Co., 158 F.3d 622, 627 (2d Cir. 1998)); see also Cantor Fitzgerald Inc., 313 F.3d

at 710 ("[A] case filed by a non-resident plaintiff requires application of the shorter statute of

limitations period, as well as all applicable tolling provisions, provided by either New York or

the state where the cause of action accrued." (citing Stuart, 158 F.3d at 627)).

   The parties dispute whether, in this case, N.Y. C.P.L.R. § 202 requires the Court

to look to Massachusetts' statutes of limitations.  A straightforward application of the undisputed

facts of this case indicates that it does.  Plaintiffs are both nonresidents (SAC ¶ 1), and all claims

accrued in Massachusetts, where the injury occurred.  See Thea, 807 F.3d at 498 ("New York

follows 'the traditional definition of accrual—a cause of action accrues at the time and in the

place of the injury.'" (quoting Glob. Fin. Corp. v. Triarc Corp., 93 N.Y.2d 525, 529 (1999)));

Dugan v. Schering Corp., 86 N.Y.2d 857, 635 (1995) (claims sounding in negligence or product

liability accrue in the state where the injury occurs).  Plaintiffs do not dispute that their claims

accrued in Massachusetts.  (Compare Def. Reply at 3 (asserting that Plaintiffs claims accrued in

Massachusetts), with Pl. Sur-Reply at 1-5 (failing to dispute that claims accrued in

Massachusetts in arguing that they were nonetheless timely under Massachusetts law).)  In fact,

Plaintiffs originally filed suit in the District of Massachusetts.  (Docket entry no. 1.)[5]  Thus, in

the instant action, Plaintiffs' claims must be timely under the limitations periods of both New

York and Massachusetts, and the Court must apply the applicable Massachusetts statute of

---

[5] The Court notes that the statutory purpose of N.Y. C.P.L.R. § 202 is, like that of many
borrowing statutes, to "prevent forum shopping by plaintiffs seeking the holy grail of the
longer [limitations] period," a purpose "best served" by "applying the period of the
foreign state."  Stuart, 158 F.3d at 627.

limitations if that limitations period is shorter than New York's.  Glob. Fin. Corp., 93 N.Y.2d at 526-28.

In computing Massachusetts' statute of limitations, the Court must include "all the extensions and tolls applied in the foreign state," including any COVID tolling orders, "so that the entire foreign statute of limitations applies, and not merely its period."  Thea, 807 F.3d at 500 (internal alterations and quotation marks omitted); see also Antone v. Gen. Motors Corp., Buick Motor Div., 473 N.E.2d 742, 747 (N.Y. 1984) ("It is true that in 'borrowing' a Statute of Limitations of another State, a New York court will also 'borrow' the other State's rules as to tolling."); Morson v. Kreindler & Kreindler, LLP, 814 F. Supp. 2d 220, 228-29 (E.D.N.Y.2011) ("[T]he Court must consider not just the accrual state's limitations period, but also that state's tolling provisions." (citing Portfolio Recovery Assocs., LLC v. King, 14 N.Y.3d 410, 416 (2010))); Afanassieva v. Page Transp. Inc., No. 21-3090, 2022 WL 7205009, at *2 (2d Cir. Oct. 13, 2022) (application of § 202 also required application of orders issued by "New Jersey's Chief Justice extending filing deadlines for 56 days" during the COVID pandemic); In re Fosamax Prods. Liab. Litig., 694 F. Supp. 2d 253, 256-59 (S.D.N.Y. 2010) (applying § 202 and concluding that claims were time-barred by Virginia's two-year statute of limitations because Virgina declined to adopt the general cross-jurisdictional equitable tolling rule adopted by "most states," including New York) (citing Am. Pipe & Constr. Co. v. Utah, 414 U.S. 538 (1974))).

The law governing the respective statutes of limitations in the instant matter is as follows.  Both states have a three- or four-year limitations period for the Plaintiffs' claims.  Compare N.Y. C.P.L.R. § 214(5) (three-year limitations period for personal injury claims), and Baker v. Stryker Corp., 770 F. App'x 12, 15 (2d Cir. 2019) (four-year limitations period for breach of warranty claims, beginning once the product is sold or enters the stream of commerce

(citing N.Y. U.C.C. § 2-725(1))), and Giambrone v. Kings Harbor Multicare Ctr., 961 N.Y.S.2d 157, 159 (App. Div., 1st Dep't 2013) (a spouse's late-added consortium claims relate back to the underlying claims), with Mass. Gen. Laws Ann. ch. 260, § 2A (West) (three-year limitations period for tort claims), and id. ch. 106, § 2-318 (three-year limitations period for breach of warranty claims), and Olsen v. Bell Tel. Lab'ys, Inc., 388 Mass. 171, 176-77 (1983) (consortium claims generally governed by three-year tort statute of limitations).  Both states toll the statute of limitations until the date the plaintiff discovers the injury.  Compare N.Y. C.P.L.R. § 214-c(2) (tolling the statute of limitations until "the date of discovery of the injury by the plaintiff"), with Bowen v. Eli Lilly & Co., 408 Mass. 204, 205-206 (1990) (tolling the statute of limitations until the date the plaintiff discovers or should have reasonably discovered that she was harmed by the defendant), and Mass. Gen. Laws Ann. ch. 106, § 2-318 (West) (breach of warranty limitations period runs on "the date the injury and damage occurs.").

Both states further tolled the statute of limitations in 2020, during the COVID pandemic.  New York's governor issued executive orders tolling New York statutes of limitations for a total of 228 days.  See N.Y. Comp. Codes R. & Regs. tit. 9, §§ 8.202.67, 8.202.8 (2020) ("New York COVID Orders") (tolling statutes of limitations from March 20, 2020, to November 3, 2020).  By contrast, the Massachusetts Supreme Judicial Court tolled Massachusetts statutes of limitations for only 105 days.  See In re: COVID-19 (Coronavirus) Pandemic, Mass. Supreme Judicial Ct., No. OE-144, slip op. at 5-6 (June 24, 2020) ("Massachusetts COVID Order") (tolling statutes of limitations from March 17, 2020 to June 30, 2020).

The time between the earliest date of discovery asserted by the parties—June 16, 2017—and the latest date of discovery asserted by the parties—October 14, 2017—is 120 days.

Because statutes of limitations in New York were tolled for 123 days longer than those in Massachusetts, New York has the longer relevant limitations period. The Court thus must apply Massachusetts' shorter statute of limitations in determining the viability of Plaintiffs' claims.

Plaintiffs filed the Complaint on October 14, 2020. Under the applicable provisions of Massachusetts law, any tort, breach of warranty, or consortium claims that accrued in the three years preceding the filing of the Complaint—that is, on or after October 14, 2017— would be timely. See Mass. Gen. Laws Ann. ch. 260, §§ 2A, 2-318 (West); Olsen, 388 Mass. at 176-77. The Supreme Judicial Court of Massachusetts, however, tolled these three-year limitations periods for 105 days, from March 17, 2020 to June 30, 2020. Massachusetts COVID Order. Because the Order "paused" all limitations periods and effectively extended the statutes of limitations applicable here, any claims that accrued in the 105 days preceding October 14, 2017—that is, on or after June 30, 2017—are also timely. In other words, summary judgment in Defendants' favor is appropriate only if Plaintiffs' claims accrued before June 30, 2017. For the following reasons, the Court finds that Plaintiffs' claims are time-barred under Massachusetts law because they accrued before June 30, 2017, beginning on or around June 16, 2017.

Accrual of Claims Asserted in Counts I, II, and III

Courts applying Massachusetts law frequently resolve the question of the time at which the statute of limitations begins to run on a motion for summary judgment. See e.g. Cornell v. E.I. Dupont DeNemours, 841 F.2d 23 (1st Cir. 1988) (affirming summary judgment on statute of limitations grounds); Buckley v. Am. Honda Motor Co., Inc., 780 F.2d 1 (1st Cir. 1985) (same); Fidler v. Eastman Kodak Co., 714 F.2d 192 (1st Cir. 1983) (same). Summary judgment is appropriate where, as here, there has been "full development of relevant facts through deposition testimony" and there is "no dispute between the parties as to the essential

evidentiary facts . . . but only the ultimate conclusions to be drawn from these facts." Fidler, 714 F.2d at 192 (internal quotations and citations omitted). Here, the parties do not contest the material facts regarding Ms. Vuksanovich's symptoms, when and how she sought medical care, or her communications with her colleagues, employer, or her employer's insurance provider. The issue of timeliness can therefore be resolved on this summary judgment motion practice.

Defendants contend that the undisputed facts demonstrate that, on June 16, 2017, Ms. Vuksanovich was on notice of the alleged causal relationship between exposure to fumes on Airbus aircraft and her myriad physical and cognitive symptoms. Plaintiffs, who bear the burden of proving facts that show their claims are not time-barred, Franklin v. Albert, 381 Mass. 611, 619 (1980), maintain that Plaintiffs' claims accrued on October 14, 2017, the date Ms. Vuksanovich stopped working and became disabled. Plaintiffs' argument is unavailing; a claim for a permanent injury does not accrue on the date that injury becomes permanent, nor is a diagnosis required to put a plaintiff on notice of her cause of action. Olsen, 388 Mass. at 174-75; see also Riley v. Presnell, 409 Mass. 239, 243 (1991) (a plaintiff "need not apprehend the full extent or nature of [her] injury in order for a cause of action to accrue").

The Massachusetts "discovery rule" of claim accrual applies here.[6] See Fidler, 714 F.2d at 199 (holding that the Supreme Judicial Court of Massachusetts applies the discovery

---

[6]    Here, the Court notes the key differences between N.Y. C.P.L.R. § 214-c(2) and Massachusetts' discovery rule. Massachusetts does not have an exception for isolated or inconsequential injuries. By contrast, a clause of N.Y. C.P.L.R. § 214-c(2) specifically carves out such an exception. It was this clause that underpinned the Court's earlier finding, at the motion to dismiss stage, that Plaintiffs' claims were not time-barred because her early symptoms lacked several of the indicia that trigger the limitations period such as whether plaintiff sought medical treatment, experienced persistent limitation of physical activity, or filed a workers' compensation claim. (MTD Order at 25 (citing In re N.Y.C. Asbestos Litig., 39 N.Y.S.3d 629, 634-35 (Sup. Ct., N.Y. Cnty. 2016)).) As Judge Failla predicted, discovery did reveal evidence that suggested the symptoms Ms. Vuksanovich suffered in the summer of 2017 were not too isolated or

rule to negligence and breach of warranty claims). [7]  Under the discovery rule, "a cause of action does not accrue until the plaintiffs know or reasonably should have known that they were injured as a result of the defendant's conduct." Cornell, 841 F.2d at 24-25 (quoting Olsen, 388 Mass. at 174-75); see also Lijoi v. Mass. Bay Transp. Auth., 28 Mass. App. Ct. 926, 928 (1990) (holding that accrual begins once a "modicum of knowledge supplants ignorance in the mind of the claimant, or may be reasonably imputed to her," regarding the likely cause of her injury).

Under the discovery rule, Plaintiffs "bear[] the burden of proving both an actual lack of causal knowledge" that cabin odors aboard Airbus aircraft caused Ms. Vuksanovich's symptoms, "and the objective reasonableness of that lack of knowledge." Doe v. Creighton, 439 Mass. 281, 283 (2003).  Because both are essential to Plaintiffs' claims, unless Plaintiffs make a showing sufficient to establish that a reasonable person in Ms. Vuksanovich's position would not have known of this causal link by June 30, 2017, summary judgment must be entered against Plaintiffs even if Ms. Vuksanovich lacked actual knowledge.[8]  See id. ("[B]ecause the plaintiff cannot demonstrate a reasonable expectation of proving an essential element of her case, the

---

inconsequential to trigger the limitations period: she sought medical treatment in June 2017, experienced persistent physical limitation that only abated briefly, and filed for workers' compensation in September 2017.  (See supra pp. 4-7.)

[7]    The Court also considers, as persuasive authority, cases applying Mass. Gen. Laws ch. 260, § 4C; the common law discovery rule and the explicit, statutory rule in section 4C are functionally the same.  Creighton, 439 Mass. at 283 (finding that the legislature adopted the "common-law 'discovery rule,'" in Mass. Gen. Laws ch. 260, § 4C); see also Clark v. Edison, 885 F. Supp. 2d 450, 454 (D. Mass. 2012) (same).

[8]    Plaintiffs cite Koe v. Mercer, 450 Mass. 97 (2007), for the proposition that, when the discovery rule applies, "what the plaintiff knew or should have known is a factual question appropriate for the trier of fact." Id. at 103; (Pl. Sur-Reply at 5).  They omit the next sentence, which offers important context: "However, in order for a plaintiff's claim to survive a summary judgment motion, he must demonstrate a reasonable expectation of proving that the claim was timely filed." Koe, 450 Mass. at 103.  The plaintiff in Koe "failed to make this showing." Id.  So have Plaintiffs here.

defendant is entitled to summary judgment." (citing <u>Dias v. Brigham Med. Assocs.</u>, 438 Mass. 317, 319 (2002))); <u>Kelley v. Eli Lilly & Co.</u>, 517 F. Supp. 2d 99, 103 (D.D.C. 2007) ("In Massachusetts, a party moving for summary judgment in a case in which the opposing party will have the burden of proof at trial is entitled to summary judgment if he or she demonstrates . . . that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case."); <u>see</u> <u>also</u> Mass. R. Civ. P. 56 (1973 Reporter's Notes observing that, apart from "a small addition," "Rule 56 . . . tracks Federal Rule 56 exactly.").

The limitations period for tort and breach of warranty claims begins once a reasonable person has notice of two things: (1) that they have been injured, and (2) that the defendant or the defendant's product may be the source or cause of that injury. The summary judgment record contains facts sufficient to furnish a reasonable person with both types of notice before June 30, 2017, and, in particular, demonstrates that Ms. Vuksanovich had both reason and means to inquire further.

When a plaintiff cannot reasonably ascertain the injury or breach at the time it occurred, her cause of action accrues "when the plaintiff knows or should know that she has been injured." <u>Eck v. Kellem</u>, 51 Mass. App. Ct. 850, 853 (2001) (internal citations omitted). Because the record contains mixed evidence as to whether Ms. Vuksanovich's initial symptoms abated or were continuous throughout June, and drawing all inferences in favor of the Plaintiffs, symptoms from that day alone could have been insufficient to put a reasonable person on notice that they had suffered the "appreciable" harm that now serves as the basis of these claims. Within the nine days following the June 16th flight, however, the seriousness and persistence of the injury would have been clear to a reasonable person. Ms. Vuksanovich sought treatment from doctors, suffered symptoms during that period that were serious enough to limit her ability

to perform household duties and engage in romantic and social relationships, and did not return to work until nine days after the flight.  (Pl. 56.1 Resp. ¶¶ 13-18, 25.)  These symptoms would have put a reasonable person on notice before June 30, 2017, that she had suffered appreciable harm during the June 16th flight.  See, e.g., Cornell, 841 F.2d at 25 ("Notice of injury is notice of appreciable harm." (citing Cantu v. St. Paul Cos., 401 Mass. 53, 56 (1987); Olsen, 388 Mass. at 175-76)).

Furthermore, the undisputed record, even when viewed in the light most favorable to Plaintiffs, reveals no genuine dispute that, on or before June 16, 2017, the prospect of a significant causal connection between cabin fumes and illness was brought directly to Ms. Vuksanovich's attention in at least three ways:  (1) information imparted during the June 16th pre-flight safety meeting "that the aircraft has experienced issues with severe 'cabin odors'" (Howard Report at 6), (2) a June 16, 2017 email from her employer, JetBlue, informing employees that people can become sick after inhaling cabin fumes and directing them to contact medical experts at a provided number with questions or concerns (Vuksanovich Deposition at 45:10-4616, 48:12-49:23; docket entry no. 127-7 at 2), and (3) word that a colleague, a JetBlue captain, had become ill as a result of cabin odors (Vuksanovich Deposition at 47:5-21).

These facts were "reasonably likely to put the plaintiff," or a reasonable person in Ms. Vuksanovich's position, "on notice that" exposure to cabin fumes during the June 16th flight caused her symptoms.  Bowen, 408 Mass. at 208.  Because Plaintiffs should have known that Ms. Vuksanovich's symptoms "'may have been' connected to" cabin odors aboard Defendants' aircraft before June 30, 2017, Plaintiffs' claims are time-barred.  Gray v. Johnson & Johnson Med., No. 98-5484, 2001 WL 1319542, at *4-5 (Mass. Super. Ct. Oct. 23, 2001); see also Lijoi, 28 Mass. App. Ct. at 928 (holding that accrual begins once a "modicum of knowledge supplants

ignorance in the mind of the claimant, or may be reasonably imputed to her," regarding the likely cause of her injury).

        The causal connection was clear: Ms. Vuksanovich smelled cabin odors, experienced symptoms, and received facts linking such symptoms to cabin odors all while aboard an Airbus aircraft.  On the first flight, to Dallas, Ms. Vuksanovich "[a]lmost immediately . . . experienced adverse symptoms" upon smelling an odor of dirty socks in the cabin.  See Robinson v. Triple S., 629 F. Supp. 3d 4, 5 (D. Mass. 2022) (immediate symptom onset, taken together with product complaints plaintiff made to her employer and frequent visits to the doctor, indicated plaintiff knew, or should have known, that the product was causing her harm); Creighton, 439 Mass. at 285 ("[P]laintiff's symptoms first appeared in the immediate wake of the abusive conduct.").  On the return flight, Ms. Vuksanovich received facts from a credible source—her employer—that cabin odors might cause negative health effects.  (Vuksanovich Deposition at 46:10-46:22 ("I remember reading [the email] . . . on the way home from Dallas to Boston.  That very same day while I was working.").)  The email clearly communicated that exposure to cabin odors could result in negative health effects.  (See id. at 50:3-21 (referring crew members to MedAire experts who can "determine the extent of a reaction [to cabin odors] and whether medical follow-up is needed"); docket entry no. 127-7, at 2 (Ms. Vuksanovich characterizing the email as "a public email was sent out to Inflight members about the steps Jet[B]lue was taking to 'fix' the cabin fumes problems").)

        Nor was Ms. Vuksanovich alone: that her fellow crew members and other JetBlue employees had become ill under similar circumstances would put a reasonable person on notice that their symptoms were not isolated or novel, but rather indicative of an illness that specifically affected crew members exposed to cabin odors.  See Sowle v. Arbochem Prods. Co., No. 2002-

01189, 2004 WL 5049454 (Mass. Super. Ct. Feb. 3, 2004) (plaintiff had inquiry notice that his symptoms were connected to use of herbicide in part because he "specifically knew that employees at [his workplace] were leery about applying [the herbicide] because they believed it caused them physical problems"). Plaintiff had previously heard of a colleague who become ill as a result of cabin odors. (Vuksanovich Deposition at 47:5-21.) On the June 16th flight, other flight attendants noticed similar odors. (Howard Report at 5-7.) And though the parties have not proffered further information regarding the experiences of others, Plaintiff alleged in her complaint that other crew members also experienced headache, nausea, burning in the throat, coughing, and shortness of breath. (SAC ¶ 53.)

        While the June 16th email may not have linked specific symptoms to cabin odors, it put Ms. Vuksanovich on notice that exposure to cabin odors, which she experienced on June 16, 2017, could have health impacts. This is not a case in which the Plaintiff faced a series of differing or conflicting medical opinions as to causation such that a prudent person would be left with uncertainty as to which of several causes was responsible. See Lindsay v. Romano, 427 Mass. 771 (1998) (genuine dispute as to whether surgeon's malpractice was discoverable by plaintiff where surgeon and subsequent treating physicians could not explain plaintiff's symptoms). Nor was there some separation of time or place that could have obscured the causal link between the fume event and Ms. Vuksanovich's symptoms, Creighton, 439 Mass. at 285 (recognizing that "a person who is victimized at an early age or over a period of years might, later in life, perceive the resulting psychological symptoms as having always been present and thus fail to connect them to a particular triggering event"), nor did the nature of the injury itself impede Plaintiffs' ability to discover its cause. See, e.g., Riley, 409 Mass. at 246 (therapist's improper sexual relationship with plaintiff "cause[d] an injury which by its very nature prevents

the discovery of its cause"); Palermo v. Brennan, 41 Mass. App. Ct. 503 (1996) (same); Clark v. Edison, 885 F. Supp. 2d 450, 454 (D. Mass. 2012) (same).

Plaintiffs argue that Ms. Vuksanovich's injury was unknowable until she learned of Airbus's allegedly faulty oil flaps on August 29, 2017.  (Pl. Sur-Reply at 6.)  This argument is unavailing because a plaintiff need not know how a particular product injured her, let alone the technological mechanism of exposure; a reasonable person in her position need only suspect that the product is the "likely cause" of her injury.  Fidler, 714 F.2d at 199 ("[N]otice of likely cause is ordinarily enough to start the statute running."); see also Albrecht v. Clifford, 436 Mass. 706, 714 (2002) (The "'inherently unknowable' standard is no different from and is used interchangeably with the 'knew or should have known' standard." (citing Williams v. Ely, 423 Mass. 467, 473 n.7 (1996))).

Plaintiffs' argument that a jury should determine whether the June 16th safety briefing clarified that cabin odors aboard the aircraft were caused by "leaking engine seals" (Pl. Sur-Reply at 6) similarly fails.  This fact is not material:  further specificity beyond knowledge of the injury and its likely connection to Defendants is not required for the limitations period to begin running.  See Bowen, 408 Mass. at 210 ("Reasonable notice that a particular product or a particular act of another person may have been a cause of harm to a plaintiff creates a duty of inquiry and starts the running of the statute of limitations."); Gray v. Johnson & Johnson Med., No. 98-5484, 2001 WL 1319542, at *4-5 (Mass. Super. Ct. Oct. 23, 2001) (finding claims accrued before plaintiff knew that the latex in defendant's gloves caused her symptoms); Murphy v. Aero-Med, Ltd., 345 F. Supp. 2d 40, 44 (D. Mass. 2004) ("The plaintiff need not . . . have identified the particular ingredient that caused her symptoms for the statute of limitations to begin running."); Doucette v. Handy & Harmon, 35 Mass. App. Ct. 724, 725 (1994) (affirming

jury instruction that it was "not necessary to the accrual of the cause of action that the plaintiff should have identified the particular ingredient of the fumes . . . that was the cause of her symptoms").

Ms. Vuksanovich's contention that she lacked actual knowledge of the causal link between her injury and cabin fumes because she "was never trained on such a thing" is also unavailing. (Howard Report at 6.) A plaintiff's individual characteristics, such as Ms. Vuksanovich's lack of training on the health effects of cabin odor exposure, are "subjective factors [that] may not be considered when making the objective analysis required" by the discovery rule. Creighton, 439 Mass. at 285-86 (finding that a psychiatric report concluding that a reasonable person in plaintiff's position would not have recognized a causal connection was not evidence of objective knowledge because the "reasonable person" posited by the psychiatrist shared plaintiffs' individual characteristics, experiences, and vulnerabilities); Koe v. Mercer, 450 Mass. 97, 103 (2007) ("Personal character traits, educational history, and cultural backgrounds are usually immaterial in determining whether a lack of knowledge is objectively reasonable."). Plaintiffs have not presented evidence supporting the objective reasonableness of Ms. Vuksanovich's claimed lack of knowledge.

Finally, whether Ms. Vuksanovich's claimed lack of knowledge was sufficient to delay accrual of her claims also turns on "whether sufficient facts were available to provoke a reasonable person in the plaintiff's circumstances to inquire or investigate further." In re Pharm. Indus. Average Wholesale Price Litig., 491 F. Supp. 2d 20, 76 (D. Mass. 2007), aff'd, 582 F.3d 156 (1st Cir. 2009). By June 30, 2017, Ms. Vuksanovich had learned facts sufficient to create a "duty to discover from the legal, scientific, and medical communities" whether she had a legally compensable claim. Fidler, 714 F.2d at 199. The June 16th email, sent by JetBlue's Vice

President of Safety to provide employees with "the protocol to follow, following a cabin air event," explicitly encouraged crew members to inquire further and gave them direct access to the "medical community." (Vuksanovich Deposition at 50:15-21; see also id. at 49:19-21 ("[W]e have engaged our trusted partner MedAire to address any medical questions you have should you encounter a cabin odor event.,"); id. at 49:24-25 ("MedAire protocol for cabin odor events"); id. at 50:3-21 ("Crews are to contact MedAire where an expert will address any concerns" by conducting a "symptom evaluation" and "individually interview[ing] crew members to determine the extent of a reaction and whether medical follow-up is needed.").) In the email, Ms. Vuksanovich was directed to a phone number where she could, and eventually did, inquire further. (Id. at 51:1-8 (testifying that she contacted MedAire in August 2017).) Ms. Vuksanovich "could have learned the necessary facts" to file the present suit earlier by reaching out to MedAire, as instructed by her employer, for symptom evaluation shortly after she experienced symptoms aboard the June 16, 2017 flight. McIntyre v. United States, 367 F.3d 38, 60-61 (1st Cir. 2004). Plaintiffs have presented no facts suggesting that conducting such inquiry would have been difficult before June 30, 2017; in fact, Ms. Vuksanovich sought treatment from other doctors earlier that same month. (Pl. 56.1 Resp. ¶ 16.)

Because Ms. Vuksanovich could have easily inquired further into whether cabin fumes caused her symptoms by calling the MedAire hotline, her assertion that she lacked knowledge before June 30, 2017 is insufficient to overcome Defendants' motion. Felton v. Lab. Rels. Comm'n, 33 Mass. App. Ct. 926, 927 (1992) (finding that a plaintiff is on notice if "the injured party, in the exercise of reasonable diligence, should have known of the factual basis for the wrong" (citing Gore v. Daniel O'Connell's Sons, Inc., 17 Mass. App. Ct. 645, 647 (1984))); see also Pitts v. Aerolite SPE Corp., 673 F. Supp. 1123, 1128 (D. Mass. 1987) (holding that

plaintiff was on notice as of the time she "approached a physician with her belief that the insulation [manufactured by defendant] might have caused her family's illness," even though she did not receive an answer from the doctor and explored no further).

A reasonable person, having been warned in a safety briefing, suffered immediate symptoms upon exposure, and read an email directing them to contact medical experts for symptom evaluation following exposure, would not have perceived the cabin odors they were exposed to that day as entirely innocuous. Cf. Armstrong v. Lamy, 938 F. Supp. 1018, 1038 (D. Mass. 1996) (holding that uncertainty about how a child perceives sexual abuse may create genuine disputes of fact). A reasonable person in Ms. Vuksanovich's position would instead have been on notice before June 30, 2017, that she had been injured by cabin odors aboard Airbus aircraft. Based on the undisputed record, Plaintiffs' claims asserted in Counts I, II, and III are time-barred.

Accrual of Consortium Claim Asserted in Count IV

Under Massachusetts law, the three-year limitation period for a consortium claim generally begins to run alongside the claims of which it is derivative. Olsen, 388 Mass. at 176-77 ("[I]n determining when [the wife's consortium] cause of action accrued, we apply the same rule as we applied to her husband's [negligence] claim."). Plaintiffs have presented no specific facts suggesting that this general rule should not apply here. For example, Plaintiffs have not proffered that there was any material gap in time between the onset of Ms. Vuksanovich's symptoms and the point at which Ms. Vuksanovich's ability to perform household duties and engage in romantic and sexual activities was so adversely affected that Mr. Vuksanovich suffered an appreciable loss of consortium. It is undisputed that their relationship was affected as early as June 16, 2017 (Pl. 56.1 Resp. ¶¶ 14-15), and a bare assertion disputing whether Ms.

Vuksanovich regained her ability to contribute to their home life at the end of June does not furnish the Court with facts necessary to determine whether Mr. Vuksanovich's loss of consortium was no longer "substantial" at that time. See Lijoi, 28 Mass. App. Ct. at 928 (tolling of the limitations period for consortium claims does not include any interval in which "the injury incubates from the substantial to the very grave," but instead begins upon appreciable loss of consortium). Like Ms. Vuksanovich's tort and breach of warranty claims, Mr. Vuksanovich's cause of action accrued by late June, and summary judgment dismissing his claims as untimely is appropriate.

Plaintiffs' Request for Application of Judicial Estoppel

Finally, Plaintiffs request in their sur-reply that the Court find that Defendants are judicially estopped from relying on New York's borrowing statute. (Pl. Sur-Reply at 5). This is a misguided argument, in part because Plaintiffs appear to take the position that the Court should apply some New York statute of limitations law—namely, the "toxic tort limitations period"— while ignoring other New York law that would, on these facts, direct the Court to apply the limitations law of a foreign state. The Court cannot do so. Because Plaintiffs are nonresidents bringing claims that arose outside of New York, federal courts in New York "must apply the shorter limitations period, including all relevant tolling provisions, of either: (1) New York; or (2) the state where the cause of action accrued." Thea, 807 F.3d at 497 (emphasis added). Irrespective of the positions the parties have taken, it is appropriate for the Court to apply N.Y. C.P.L.R. § 202 here. See In re Fosamax, 2014 WL 3950674, at *3 (applying New York's borrowing statute); Haimowitz v. Novartis Pharms. Corp., 148 F. Supp. 3d 327 (S.D.N.Y. 2015) (same).

Nor is judicial estoppel available.  The doctrine "prevents a party from asserting a <u>factual</u> position in a legal proceeding that is contrary to a position previously taken by him in a prior legal proceeding."  <u>Bates v. Long Island R.R. Co.</u>, 997 F.2d 1028, 1037 (2d Cir. 1993) (emphasis added).  The Court rejects as baseless Plaintiffs' argument that Defendants' application of New York's toxic tort limitations period at the motion to dismiss stage of the instant case was a factual position.  The law that governs the statute of limitations in the instant case is not a factual question, nor does this dispute concern a position taken in a prior legal proceeding.[9]  The request for a finding of judicial estoppel is, accordingly, denied.

CONCLUSION

For the foregoing reasons, Defendants' first motion for summary judgment is granted.  The Court grants judgment in favor of Defendants, dismissing all of Plaintiffs' claims as time-barred.  In light of this determination, the Court denies Defendants' second motion for summary judgment and Defendants' motions to preclude the testimony of Dr. Susan Michaelis, Dr. Judith Anderson, Dr. Vyvyan Howard, Dr. Dieter Scholz, and Ms. Vuskanovich's medical providers as moot.  The Court also denies the motion for oral argument because, upon a careful review of the written record and advocacy, the Court has determined that the motions can properly be resolved on submission.

---

[9]     Plaintiffs' cited cases support, at most, judicial estoppel of purely factual positions (such as the ownership of specific patents) that are inconsistent across the same legal proceeding.  (<u>See</u>, <u>e.g.</u>, Pl. Sur-Reply at 7 (citing <u>Intellivision v. Microsoft Corp.</u>, 484 F. App'x 616 (2d Cir. 2012)).)

Accordingly, this Memorandum Opinion and Order resolves docket entry nos. 124, 189, 190, 191, 192, 193, 194, and 204.  The Clerk of Court is respectfully directed to enter judgment and close this case.


SO ORDERED.

Dated: New York, New York
        September 30, 2025

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
Chief United States District Judge
